(LOCAL LAW.)

## The MUTUAL ASSURANCE SOCIETY v. WATTS Executor.

Under the 6th and 8th sections of the act of Assembly of Virginia, of the 22d of December, 1794, property pledged to the Mutual Assurance Society, &c., continues liable for assessments, on account of the losses insured against, in the hands of a *bona fide* purchaser without notice.

A mere change of sovereignty produces no change in the state of rights existing in the soil; and the cession of the District of Columbia to the national government did not affect the lien created by the above act on real property situate in the town of Alexandria, though the personal character or liability of a member of the society could not be thereby forced on a purchaser of such property.

APPEAL from the circuit court in the District of Columbia for Alexandria county. The cause was argued by *Swann*, for the appellants, and by *Taylor* and *Lee*, for the respondents.

JOHNSON, J., delivered the opinion of the court, as follows: March 16th.

This is a bill in chancery, filed by the complainants, to charge certain premises, in the possession of the defendant, situate in the town of Alexandria, with the payment of a sum of money, assessed in pursuance of the laws establishing the Mutual Assurance Society, for quotas becoming due after his testator acquired possession. The executor has, in fact, sold the premises, under a power given him by the testator, but the money remains in his hands; and it is conceded that the sole object now contended for is, to charge the money arising from the sale of the land in question with the assessment to which it is contended that the land was liable. The insurance was made in 1799, and the property sold to the defendant's testator in 1807, long after the town of Alexandria ceased to be subject to the laws of Virginia. It is admitted that the sale was made without notice of this incumbrance, (if it was one,) and the quota demanded was assessed on the premises for a loss which happened subsequent to the transfer. The points made in the case arise out of the construction of the 6th and 8th sections of the act of Virginia, passed the 22d of December, 1794. The 6th section is in these words: " If the funds should not be sufficient, a repartition among the whole of the persons insured shall be made, and each shall pay, on 'emand of the cashier, his, her, or their share, according to the sum insured, and rate of hazard at which the building stands, agreeably to the rate of premium, for which purpose it is hereby declared that the subscribers, as soon as they shall insure their property in the Assurance Society aforesaid, do mutually, for them-

selves, their heirs, executors, administrators and as-
signs, engage their property insured as security, and
subject the same to be sold, if necessary, for the pay-
ment of such quotas." And the 8th section is in
these words; " To the end that purchasers or mort-
gagees of any property insured, by virtue of this act,
may not become losers thereby, the subscriber sell-
ing, mortgaging, or otherwise transferring such pro-
perty, shall, at the time, apprise the purchaser or
mortgagee of such assurance; and endorse to him
or them the policy thereof. And in every case of
such change the purchaser or mortgagee shall be
considered as a subscriber in the room of the ori-
ginal, and the property so sold, mortgaged, or other-
wise transferred, shall still remain liable for the pay-
ment of the quotas, in the same manner as if the right
thereof had remained in the original owner."

In the argument two points were made, 1st. That
property pledged to the society remained liable for
the quotas to a purchaser without notice. 2d. That
the purchaser, by the purchase of such property, al-
though without notice, became, by virtue of the 8th
section, a member of the society, and liable, in all
respects, as such.

The second of these questions is now withdrawn
from the consideration of this court by an agreement
entered on record. And it must be admitted, that
whatever may be the strict construction of the 8th
section and its operation in the state of Virginia, so
far as it is intended to force on the purchaser a per-
sonal character or liability, it could have no operation
in the town of Alexandria, at the date of this trans-

1816.

Mutual Ass.
Society
v.
Watts' Exe-
cutor.

1816.
Mutual Ass.
Society
v.
Watts' Executer.

fer. The laws of Virginia had then ceased to be the laws of Alexandria, and it could only be under an actually existing law, operating at the time of the transfer, that the character of membership in the Virginia company would be forced upon the purchaser. This is not one of those cases in which tenure attaches to an individual a particular characteristic or obligation; such cases arise exclusively between the occupant of the soil and the sovereignty which presides immediately over the territory. The transfer, therefore, of the district of Alexandria to the national government, put an end to the operation of the 8th section, so far as it operated by mere force of law, independent of his own consent, to fasten on the purchaser the characteristics of a member. But it is otherwise with regard to the soil. The idea is now exploded that a mere change of sovereignty produced any change in the state of rights existing in the soil. In this respect every thing remains in the actual state, whether the interest was acquired by law, under a grant, or by individual contract.[a]

We consider the question, then, as reduced to this: Does property, pledged to the society, continue liable for assessments in the hands of a *bona fide* purchaser without notice, notwithstanding that he does not become a member by the transfer?

Here we give no opinion on the extent or meaning of the words " property insured," how far they will operate to charge the lands on which buildings stand. The question was not made in the argument, and is

[a] Vide 6 *Crunch*, 199. Korn v. The Mutual Assurance Society.

probably of no consequence in this or any other case. We only notice it, in order that such a construction may not be supposed admitted, as is too often concluded, because a court passes over a question *sub silentio*.

Whatever be the property thus pledged, it is very clear that the words of the 6th section are abundantly sufficient to create in it a common law lien, not only in the hands of the original subscriber, but by express words in those of his *assignee*. If the case rested here, there would be no doubt or difficulty; but every law, and every contract, must be construed with a reference to the subject of that law or contract, and which it is designed to answer. In this view we readily concede, that the duration of the lien could not extend beyond the duration of the liability of the subscriber to pay the premium; nor could the liability of the subscriber extend beyond the liability of the company to indemnify him. On the other hand, it would seem that as long as the company could exact of the subscriber the premium, they ought to be held liable to indemnify him. It will, then, be conceded that the liability of the subscriber, and of the company, are mutual, correlative, and co-extensive, and it remains to be examined how this concession affects the case.

It is very clear that there are but three ways by which a subscriber can cease to be a member: 1st. By the consumption of the buildings insured, which results from the nature of the contract. 2d. By complying with the stipulations of the 9th article of the rules and regulations of the society.

3d. By substituting a vendee in his place, in confor-mity with the 8th section of the act of the 22d De-cember, 1794. If, then, a subscriber has not become discharged in one of these three ways, what is to prevent the society from pursuing their summary remedy against him? They are not bound to search for his vendee, or to raise the money by a sale of the property pledged; much less are they bound to prosecute their remedy against a purchaser whose name is unknown to them, or who may be absent from the state, or from the United States, or insol-vent, or protected, at the time, by some legal privi-lege. Their contract is with the original subscri-ber; their rules point out the mode in which he is to extricate himself from this liability, and if he has not pursued it, what defence is left him against a suit instituted by the society? The court cannot imagine one that could avail him. He cannot urge that he has parted with the property. The rules point out to him the conduct that he is to pursue in that event. He may give notice to the vendee of the insurance, and tender an assignment. If the ven-dee refuse to receive it, he is bound to remain but six weeks longer under the obligation to pay his quotas and indemnify the vendee, at the end of which time he will be entitled to a discharge, upon giving due notice, and complying with the other requisi-tions of the 9th section. Nor can he urge that he has no longer any interest in the thing insured; this, if any plea at all, is none in his lips. It belongs to the insurer to avail himself of it, if it belongs to any one. But it is a plea not true in fact; for he conti-

nues to indemnify his vendee against the quotas that
may be assessed, which, by possibility, may reach to
the value of the whole property sold or insured;
and, if correct in principle or fact, still this plea
could not avail him, since it is in consequence of his
own folly or laches that he continues liable to pay
the premium of insurance for another's property.
And should it be urged that this would be convert-
ing an actual insurance into a wager policy, two
answers may be given to it, either of which is suf-
ficient; that there is nothing illegal in a wager policy,
in itself, and if there were, it is no objection in this
case, when it results from the constitution and laws
of the society.

But it may be contended that the insurer is dis-
charged, and, therefore, the liability for the quotas
ceases.

It is unquestionably true, as a general principle,
that where an insurer runs no risk, equity does not
consider him entitled to a premium; and, although
there exist some reasons in the policy and constitu-
tion of this society to apply it, in its fullest extent, to
this case, yet, to give the argument its utmost
weight, we are disposed to concede it. But what
has occurred in this case to discharge the underwri-
ters from their contract? The subscriber was clear-
ly not discharged from his liability to them, and this
single consideration furnishes a strong reason for
holding them still bound under their contract. What
has the subscriber done inconsistent with that con-
tract? The only act he can be charged with, is
alienating, without endorsing, the policy. But aliena-

1816.

Mutual Ass.
Society
v.
Watts' Exe-
cutor.

tion alone is perfectly consistent with the contract, for the policy issues to him and his assigns; and so far from interposing any obstruction to alienation, provision is made for that very case, and unlimited discretion vested in the subscriber to endorse his policy to whom he pleases. Nor is alienation, without endorsing the policy, considered in any more offensive light; inasmuch as the 8th section which enforces the assignment, declares expressly, that it is for the benefit of purchasers and mortgagees, " to the intent that they may not become losers thereby." It is not pretended that it is for the society's own security; nor do they ever require notice to be given them in case of such transfer of the policy. As to them, therefore, it is an innocent act, and we see no ground on which the society can be discharged, either to the vendor or vendee—they certainly remain liable, and although it may be a question to which of them equity would decree the money, yet to one or the other it certainly would be adjudged; but it is not material to this argument which, as it is a question between the vendor and vendee,

If, then, the case presents no legal ground for discharging either insurer or insured from the contract, and the lien created by the 6th section be commensurate with the liability of the insured, it will follow, that the plaintiffs, in this case, ought to have a decree in their favour.

But we will examine, at a closer view, the liability of the property in the hands of the vendee. That he is not liable to the summary remedy is evident from a variety of considerations. He must, then, be

brought into chancery to have his property subject-
ed to the consequences of the lien, whenever a loss
happens. and a quota ,is assessed.   In that case, his
defence will always be just what it is in this—that
he purchased without notice.   But this was never
held to be a defence to a bill to foreclose a mortgage,
which is precisely a similar case to this.   Nor is it
any better defence to urge that he could derive no
benefit under the policy in case of a loss; for this is
precisely the same defence, a little varied, as will
be seen by supposing that the vendee of a mort-
gagor should plead, to a bill of foreclosure, that the
money borrowed did not come to his use.   But his
case is not as good as that of the vendee of the
mortgagor in the case supposed; for the 8th section
makes provision for his relief.   That section says,
" To the end that purchasers, or mortgagees, of any
property insured, may not become losers thereby,"
the vendor shall give them notice, and endorse the
policy over.   In what manner shall the purchasers,
or mortgagees, become losers, unless the lien is to
continue on the property in their hands ?   If the
vendor be guilty of the folly of paying the quotas;
and the vendee never receives notice of the lien,
through a demand from the society, there is no da-
mage sustained.   If he should be assailed with such
a demand, he has a right to require of the vendee an
assignment of the policy ; and as there existed an ori-
ginal duty to make such an assignment, it may well
be held to operate, *nunc pro tunc*, and carry with it
all the benefits of an original assignment.

1816.

Mutual Ass.
Society
v.
Watts' Exe-
cutor.

But it is contended, that the 8th section explains and limits the 6th section in such a manner as to restrict the duration of the lien in the hands of the vendee to those cases only in which the transfer of the policy also takes place.

This consequence cannot be logically maintained. The argument is, that the words "such change," mean only a change of the property, attended with an assignment of the policy, and that if the legislature had supposed that property sold would, in the hands of the vendee, remain subject to the lien, they would not expressly have subjected it in such a case. But this section will, with philological correctness, admit of a different construction, and a construction more consistent with legal principles, inasmuch as it will not admit of an implication inconsistent with the preceding section, and even with other parts of the same section. Nor, if the construction on which this argument is founded were unavoidable, would the conclusion follow which the argument asserts. The question is, what is the meaning of the words "in every change," in the section under consideration? The solution is only to be found by referring to the preceding and only other clause of the same section; and there we find, that a general provision is inevitably to be made for every possible change of sale or purchase. The operation of the clause will, then, be only to confirm and support the general words of the sixth section, and if it left any doubt with regard to the duration of the lien in the hands of the vendee, to remove those doubts by express provision. This construction is also the most consistent with the re-

cital in the first clause of the same section, which, as
has been before observed, with another view, is
founded altogether on the idea that property sold
remained pledged to the society in the hands of the
vendee, whether with or without notice; as, in that
case alone, could vendees, or mortgagees, need the
protection held out to them in that clause.

But if a different construction could legally be
given to that section, so as to restrict the words
" every such case," to mean those cases only which
were attended with an assignment of the policy, it
would not follow that the lien ceased its operation
in all others. To apply to this case the maxim,
*expressio unius est exclusio alterius*, would be a glaring
sophism. For, the only principle on which such a
conclusion could be founded would be, that the re-
petition of a legal provision, included, with many
others, in another law, produced a repeal of all others
by necessary implication. Such an implication may
be resorted to, in order to determine the intention of
the legislature in a case of doubtful import, but can-
not operate to destroy the effect of clear and une-
quivocal expressions. An obvious and unanswera-
ble objection to giving this effect to this clause, is,
that it puts it in the power of the subscriber to exo-
nerate the property from the lien by the single act of
sale, not even sustaining it for the term of six weeks
after the notice given of his intention to withdraw;
an effect glaringly inconsistent, no less with the ex-
press words than with the general view of the law
on this subject. For there is nothing in the act
which obliges the vendee to accept an assignment,

1816.

Mutual Ass.
Society
v.
Watts' Exe-
cutor.

A tender to him, therefore, cannot subject him to any onerous consequences. He does no more than what he may lawfully do. If, then, the lien ceases, unless he accepts the assignment, and it is legally at his option to accept or refuse, the subscriber, in having the right to sell to whom he pleases, has also the duration of the lien submitted to his will.

Some difficulty has also existed in the minds of some of the court on the contingent nature of this lien, whether the lien was complete to all purposes at any period before the assessment of a quota. But, on this subject, the majority are of opinion, that, as to legal incumbrancy, or duration of a lien, it makes no difference whether its object is to secure an existing debt, or a contingent indemnity. In the case of Black et al, mortgagees of Gardner, v. Kraig & Mitchell, this court sustained a mortgage, given to secure an endorser against notes which he might endorse, where he had entered into no stipulation to endorse for the mortgagor. And, in the case of bonds given for the discharge of duties, offices, or annuities, it never was maintained as an objection, that the object of the lien was future, contingent, or uncertain. In this case the mutual stipulation to indemnify each other against losses operates as a purchase of the lien, and places the parties on strong equitable grounds as to each other.

Some cases were cited in the argument from the reports of decisions which have been made in the courts of Virginia. This court uniformly acts under the influence of a desire to conform its decisions to those of the state courts on their local laws; and

would not hesitate to pay great respect to those decisions, if they had appeared to reach the question now under consideration. But they are persuaded that those cases do not come up to the present. In the case of Greenhow et al v. Barton, (1 *Munf.* 598.,) it is true, that the decision of the district court, which was finally confirmed, was in favour of the purchaser without notice. But it was solely on the question, whether he was liable to the summary remedy, or, in other words, liable generally, as a member. And the case of Anne Byrd, reported in the cases of the general court, was likewise the case of a motion for a summary judgment. In the latter case, the court went much further in charging the vendee than this court is called upon to proceed in the present case. But in neither of those cases was a bill filed to charge the vendee, as in the present; nor was the question brought up in either detached from that of his general liability as a member.

The decree below will be reversed, and a decree ordered to be entered for the complainants.

LIVINGSTON, J., and STORY, J., dissented.

Decree reversed.