**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-2002**

BRIAN DAVISON,

Plaintiff - Appellee,

v.

PHYLLIS RANDALL, In her official and individual capacity,

Defendant - Appellant,

and

LOUDOUN COUNTY BOARD OF SUPERVISORS, In their official and individual capacities; LEO ROGERS, In his official capacity; TONY BUFFINGTON, In his official capacity; RON MEYER, In his official capacity; GEARY HIGGINS, In his official capacity,

Defendants.

------------------------------

LOCAL GOVERNMENT ATTORNEYS OF VIRGINIA, INC.; INTERNATIONAL MUNICIPAL LAWYERS ASSOCIATION; VIRGINIA ASSOCIATION OF COUNTIES; VIRGINIA MUNICIPAL LEAGUE,

Amici Supporting Appellant,

AMERICAN CIVIL LIBERTIES UNION; ACLU OF VIRGINIA; ACLU OF MARYLAND; ACLU OF NORTH CAROLINA; ACLU OF SOUTH CAROLINA; ACLU OF WEST VIRGINIA,

Amici Supporting Appellee.

BRIAN C. DAVISON,

        Plaintiff - Appellant,

    v.

PHYLLIS RANDALL, In her official and individual capacity; LOUDOUN COUNTY BOARD OF SUPERVISORS, In their official and individual capacities,

        Defendants - Appellees,

    and

LEO ROGERS, In his official capacity; TONY BUFFINGTON, In his official capacity; RON MEYER, In his official capacity; GEARY HIGGINS, In his official capacity,

        Defendants.

Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. James C. Cacheris, Senior District Judge. (1:16-cv-00932-JCC-IDD)

Argued: September 26, 2018                    Decided: January 7, 2019

Before KEENAN, WYNN, and HARRIS, Circuit Judges.

Affirmed by published opinion. Judge Wynn wrote the opinion, in which Judge Keenan and Judge Harris concurred. Judge Keenan wrote a separate concurring opinion.

**ARGUED:** Scott E. Gant, BOIES SCHILLER FLEXNER, LLP, Washington, D.C.; Leo P. Rogers, LOUDON COUNTY ATTORNEY, Leesburg, Virginia, for Appellant/Cross-Appellee. Katherine A. Fallow, KNIGHT FIRST AMENDMENT INSTITUTE AT

COLUMBIA UNIVERSITY, New York, New York, for Appellee/Cross-Appellant. **ON BRIEF:** Aaron E. Nathan, BOIES SCHILLER FLEXNER LLP, Washington, D.C., for Appellant/Cross-Appellee. Jameel Jaffer, Carrie DeCell, KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY, New York, New York, for Appellee/Cross-Appellant. Vishal Agraharkar, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF VIRGINIA, Richmond, Virginia; Esha Bhandari, Vera Eidelman, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York; Susan K. Dunn, ACLU OF SC FOUNDATION, INC., Charleston, South Carolina; Christopher Brook, AMERICAN CIVIL LIBERTIES UNION OF NORTH CAROLINA LEGAL FOUNDATION, Raleigh, North Carolina; Deborah A. Jeon, ACLU FOUNDATION OF MARYLAND, Baltimore, Maryland; Jennifer D. Oliva, ACLU OF WEST VIRGINIA FOUNDATION, Charleston, West Virginia, for Amici American Civil Liberties Union, ACLU of Virginia, ACLU of Maryland, ACLU of North Carolina, ACLU of South Carolina, and ACLU of West Virginia. Joshua A. Geltzer, Douglas Letter, Amy L. Marshak, Mary B. McCord, INSTITUTE FOR CONSTITUTIONAL ADVOCACY AND PROTECTION GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C.; Kwaku A. Akowuah, Christopher C. Fonzone, Kate Heinzelman, SIDLEY AUSTIN LLP, Washington, D.C., for Amici Curiae First Amendment Legal Scholars.

---

WYNN, Circuit Judge:

Phyllis Randall, Chair of the Loudoun County, Virginia, Board of Supervisors (the "Loudoun Board"), brings this appeal, arguing that the district court erred in concluding that she violated the First Amendment rights of one of her constituents, Brian Davison, when she banned Davison from the "Chair Phyllis J. Randall" Facebook page she administered. In a cross appeal, Davison principally argues that the district court erred in dismissing his procedural due process claim premised on the ban. For the reasons that follow, we affirm.

## I.

### A.

Randall has chaired the Loudoun County Board of Supervisors since January 1, 2016. The day before she was sworn in as chair, Randall created the "Chair Phyllis J. Randall" Facebook Page (the "Chair's Facebook Page"). According to Facebook, Inc., unlike personal Facebook profiles, which are for non-commercial use and represent individual people, Facebook "Pages"—like the Chair's Facebook Page—"help businesses, organizations, and brands share their stories and connect with people." J.A. 403. "Pages are managed by people who have personal profiles," the company explains. J.A. 403. In addition to the Chair's Facebook Page, Randall created and maintained two other Facebook profiles: a personal profile and a Page devoted to her campaign. Randall classified her campaign page as belonging to a "politician" and used no designation for her personal profile, but she designated the Chair's Facebook Page as a "governmental official" page. J.A. 209–10.

4

Randall and her Chief of Staff, Jeanine Arnett, share administrative control over the Chair's Facebook Page, although Randall almost exclusively controls the page's content. On her campaign page, Randall characterized the Chair's Facebook Page as her "county Facebook page" stating:

> I really want to hear from ANY Loudoun citizen on ANY issues, request, criticism, complement or just your thoughts. However, I really try to keep back and forth conversations (as opposed to one time information items such as road closures) on *my county Facebook page (Chair Phyllis J. Randall)* or County email (Phyllis.randall@loudoun.gov). Having back and forth constituent conversations are Foiable ([Freedom of Information Act]) so if you could reach out to me on these mediums that would be appreciated.

J.A. 455 (emphasis added).

The Chair's Facebook Page includes three columns. The left column, which is topped by a picture of Randall, includes several links to allow visitors to quickly navigate the contents of the Chair's Facebook Page.

The middle column, which is organized in reverse chronological order similar to a personal profile's News Feed, is composed of posts by Randall and comments by Facebook users on those posts. Randall's posts are almost always directed to "Loudoun," *see, e.g.*, J.A. 408–10, and deal with numerous aspects of Randall's official responsibilities. For example, Randall used the Chair's Facebook Page to notify the public about upcoming Loudoun Board meetings, and the subjects to be discussed during those meetings. Randall also used the page to inform Loudoun County residents about significant public safety issues. *See, e.g.*, J.A. 412 (stating that Loudoun Board had "been informed by the Sheriff's Office about the non-legitimate threat made on social

5

media toward Dominion High School in Sterling"); J.A. 418 (reporting that she "ha[d] been briefed regarding the student falling from the water tower this morning" and advising the public to "not make any assumptions but wait for information"). And Randall used the Chair's Facebook Page to coordinate Loudoun County's response to a large snow storm, including to communicate with constituents regarding which municipal streets required plowing.

Other posts by Randall to the Chair's Facebook Page invited members of the public to apply to participate on a public commission and to participate in public meetings regarding key issues facing Loudoun County residents, such as revised flood plain zones and the Zika virus. Randall also authored posts regarding a variety of trips and meetings she had taken in furtherance of Loudoun County business. *E.g.*, J.A. 408 (reporting that Randall "address[ed] the (county) role in Treatment" at a "regional conference on Opioid and Substance Abuse Addiction"); J.A. 410 (stating that Randall represented Loudoun County at its "annual credit rating presentation" in New York); J.A. 415 (informing public of trip to Loudoun's "Sister City" in Germany); J.A. 426 (reporting that Randall was "in Richmond lobbying for [Loudoun County's] legislative program"). Finally, Randall used the page to advise the public regarding official actions taken by the Loudoun Board. *E.g.*, J.A. 433 (reporting that Loudoun Board "approved funding for new breathing apparatus for our Loudoun Firefighters"); J.A. 442 (listing several "proclamations of note" by the Loudoun Board); J.A. 443 (informing public that Loudoun Board "adopted a budget for Fiscal Year 2017 totaling $2.46 billion for the general county government and schools"). Although Randall's posts on the Chair's

6

Facebook Page principally addressed her official responsibilities, a few posts addressed topics less closely related to her official activities such as her affection for the German language or pride in becoming an organ donor.

Members of the public, including Davison, "liked"[1] or commented on several of Randall's posts on the Chair's Facebook Page. Each "like" or comment identified the name of the personal profile or Page of the authoring party. Many of the comments thanked Randall and the Loudoun Board for representing the public's interests. Other posts by members of the public offered feedback on various issues faced by Randall and the Loudoun Board. *E.g.*, J.A. 427 (stating that "[p]utting recreation in a flood plain is not a good idea"); J.A. 448 (stating that "more needs to be done with the explosion of Lyme disease in Loudoun"). And other comments dealt with constituent-specific issues. *E.g.*, J.A. 415 (constituent stating, in response to post by Randall regarding visit to Loudoun County's "Sister City" in Germany, that constituent's "daughter is interested in exchange programs"); J.A. 454 (stating that "there [we]re no [snow] plows to be seen" in a particular neighborhood). Finally, several comments, including a number authored by Davison, criticized the Loudoun Board, generally, and Randall, in particular, for actions taken in their official capacities. *E.g.*, J.A. 429–30 (Davison criticizing public school system budget and expenditures); J.A. 438–39 (member of public criticizing governmental entity's inspection of farm, claiming it failed to uncover animal abuse);

---

[1] "'Liking' on Facebook is a way for Facebook users to share information with each other." *Bland v. Roberts*, 730 F.3d 368, 385 (4th Cir. 2013).

J.A. 449 (Davison characterizing question he posed at Loudoun Board and Loudoun School Board joint town hall). On some occasions, Randall responded to these comments or criticisms.

In the right column of the Chair's Facebook Page, the page is identified as a "government official" page. It provides contact information for Randall's county office, including her office telephone number, Randall's official county email address, and the internet address for the official county website. The column also identifies how many and which Facebook personal profiles and Pages "like" and "follow" the Chair's Facebook Page.[2] And the column includes a list of personal profiles and Pages "liked" by the Chair's Facebook Page.

Randall publicized the Chair's Facebook Page in her official "Chair Phyllis J. Randall" newsletter, which is prepared by County employees, hosted on the County's website, and distributed to Loudoun citizens using Randall's official county email account. The newsletter ends with the words "STAY CONNECTED" and a Facebook icon that hyperlinks to the Chair's Facebook Page. Randall also highlighted the Chair's Facebook Page in "Winter Storm Information" notices emailed from her official county account to Loudoun County residents, advising recipients to "Visit [the Chair's Facebook Page] for Updates." J.A. 341–42, 344.

_____

[2] According to Facebook, "[l]iking a Facebook Page means you are connecting to that Page. When you connect to a Page, it will appear in [a user's] timeline and [the user] will appear on the page as a person who likes that Page. The Page will also be able to post content into [the user's] News Feed." *Bland*, 730 F.3d at 385 (internal quotation marks omitted).

8

Davison, an outspoken resident of Loudoun County, apparently largely focuses his civic engagement and expression on "the funding and . . . management of public schools." J.A. 95. To that end, he has repeatedly expressed concern about "School Board members failing to disclose personal conflicts as required by law before voting on financial transactions before the School Board." J.A. 96.

On February 3, 2016, Davison attended a Loudoun town hall meeting that included the Loudoun County School Board and Randall. At the meeting, Davison submitted a question implying that certain School Board members had acted unethically in approving financial transactions. Randall volunteered to answer the question but characterized it as a "set-up question" that she did not "appreciate." J.A. 103. Shortly after Randall answered the question—and while the town hall meeting was still ongoing—Davison posted a message on Twitter in which he tagged Randall: "@ChairRandall 'set up question'? You might want to strictly follow FOIA and the COIA as well." J.A. 470–71.

Later that evening, Randall posted about the town hall meeting on the Chair's Facebook Page, describing "what was generally discussed at the meeting." J.A. 268. In response, Davison then used one of the Facebook Pages he manages through his personal Facebook profile—"Virginia SGP," which Davison frequently uses to post political commentary—to comment on Randall's post about the town hall meeting. Although neither Davison nor Randall remember the precise content of Davison's comment, Randall testified that it contained "accusations" regarding School Board members' and their families' putative conflicts of interest related to municipal financial transactions,

9

suggesting, in Randall's opinion, that School Board members had been "taking kickback money." *See* J.A. 268–69, 289–90. Randall stated that she "had no idea if any of th[e] [accusations] w[ere] correct," but she determined that the post was "probably not something [she] want[ed] to leave" on the Chair's Facebook Page. J.A. 269. Randall then "deleted the whole post," including her original post regarding the town hall meeting, Davison's comment and replies thereto, and all other public comments. J.A. 269. Randall also banned Davison's Virginia SGP Page from the Chair's Facebook Page, which precluded Davison from using his Virginia SGP Page from commenting on the Chair's Facebook Page. The next morning, about twelve hours later, Randall reconsidered her actions and unbanned Davison's Virginia SGP Page.

B.

On November 3, 2016, Davison filed an amended complaint seeking declaratory and injunctive relief under 42 U.S.C. § 1983 against Randall, in both her official and individual capacities, and the Loudoun Board alleging that the "banning of [Davison] from commenting on [the Chair's Facebook Page] is viewpoint discrimination." J.A. 31. Davison further alleged that the ban violated his procedural due process rights protected by the Fourteenth Amendment because "Randall blocked Davison's constitutionally protected speech on [the Chair's Facebook Page], a limited public forum, without prior notice and without providing an opportunity for appealing [her] decision." J.A. 32. Davison did not challenge Randall's deletion of his post.

On March 6, 2017—four days before the close of discovery and approximately two months before trial—Davison moved for leave to amend his complaint a second time

10

to add claims under the Virginia Constitution that were materially indistinguishable from his previously asserted First and Fourteenth Amendment claims premised on the ban, as well as a separate First Amendment claim against the Loudoun Board. Davison's proposed new First Amendment claim theorized that the County violated his free speech rights by choosing to use Facebook Pages as public forums, when Facebook allows private users to restrict access to their posts, including posts to any Page a municipality designates as a limited public forum. Pl.'s Mem. in Supp. of Mot. for Leave to File Second Am. Compl. 3–9, *Davison v. Loudoun County Bd. of Supervisors*, 16-cv-932-JCC-IDD, ECF No. 68. The district court referred the motion to a magistrate judge, who granted leave to amend regarding the claims under the Virginia Constitution but denied leave as to the new First Amendment claim against the Loudoun Board. Davison lodged objections to the magistrate judge's partial denial of leave to amend, which objections the district court overruled.

Around the same time, Randall and the Loudoun Board each moved for summary judgment. The Loudoun Board asserted that the municipality could not be held liable for Randall's banning of Davison from the Chair's Facebook Page because the Chair's Facebook Page was not an official municipal page and because Randall, not the Loudoun Board as a body, was solely responsible for creating and administering the Chair's Facebook Page. The Loudoun Board and Randall further asserted that the Chair's Facebook Page did not amount to a public forum, and therefore Randall's ban of Davison's Virginia SGP Page did not implicate his free speech or procedural due process rights. Finally, Randall asserted that she was entitled to qualified immunity.

11

On May 10, 2017, the district court granted summary judgment in favor of the Loudoun Board, dismissing it from the suit. But as to Randall, the district court concluded that Davison's evidence established a material dispute of fact as to whether the Chair's Facebook Page amounted to a limited public forum and whether Randall, in her individual capacity, acted under color of state law in banning Davison from the Chair's Facebook Page. *Davison v. Loudoun Cty. Bd. of Supervisors*, No. 1:16-cv-932, 2017 WL 1929406, at *6–9 (E.D. Va. May 10, 2017). The district court also rejected Randall's qualified immunity argument. *Id.* at *8.

Following a one-day bench trial of Davison's claims against Randall, the district court issued a memorandum opinion and order awarding judgment in Davison's favor on his claims under the First Amendment and the analogous free speech provision in the Virginia Constitution. *See Davison v. Loudoun Cty. Bd. of Supervisors*, 267 F. Supp. 3d 702, 714–18 (E.D. Va. 2017). The district court further entered judgment in Randall's favor on Davison's federal and state procedural due process claims. *Id.* at 719–22. As to remedy, the district court denied Davison's request for injunctive relief but granted Davison's request for a declaratory judgment to resolve the "uncertainty regarding the legal status of [the Chair's Facebook Page]." *Id.* at 723.

Randall and Davison, respectively, filed this appeal and cross appeal.

II.

On appeal, Randall argues that (A) Davison failed to establish standing to obtain prospective declaratory relief based on Randall's alleged First Amendment violation; (B) the district court erred in concluding that Randall acted under "color of state law" when

12

she banned Davison's Virginia SGP Page from the Chair's Facebook Page; and (C) the district court erred in concluding that Randall's banning of Davison's Virginia SGP Page violated the First Amendment.

A.

Notwithstanding that she did not challenge Davison's standing below—and therefore that the district court never squarely addressed his standing—Randall now argues that Davison failed to establish Article III standing to support the district court's award of prospective declaratory relief. Even though Defendants did not challenge Davison's standing below, "standing to sue is a jurisdictional issue of constitutional dimensions, and it may be raised and addressed for the first time on appeal." *Hodges v. Abraham*, 300 F.3d 432, 443 (4th Cir. 2002). This Court reviews de novo "whether a district court possessed jurisdiction in a declaratory judgment proceeding." *Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 591 (4th Cir. 2004).

To establish Article III standing, a plaintiff must prove that: "1) he or she suffered an 'injury in fact' that is concrete and particularized, and is actual or imminent; 2) the injury is fairly traceable to the challenged action of the defendant; and 3) the injury likely will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 396 (4th Cir. 2011). Randall does not dispute that any injury Davison suffered is fairly traceable to her decision to ban him from the Chair's Facebook Page. Nor does Randall dispute that any such injury would be remedied by a favorable decision. Rather, Randall claims that Davison failed to adduce evidence

13

establishing that he suffered an "injury in fact" sufficient to support prospective declaratory relief.

"Injury in fact is 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016)). Because "'[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects,'" a plaintiff seeking "declaratory or injunctive relief . . . must establish an ongoing or future injury in fact." *Id.* at 287–88 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)). Significantly, this Court—along with several other circuits—has held that "standing requirements are somewhat relaxed in First Amendment cases," particularly regarding the injury-in-fact requirement. *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013) (collecting cases).

In *Kenny v. Wilson*, 885 F.3d 280 (4th Cir. 2018), this Court addressed what evidence a plaintiff seeking relief under the First Amendment, like Davison, must put forward to establish a future injury-in-fact adequate to confer Article III standing to obtain prospective declaratory relief. In *Kenny*, several high school students lodged First Amendment challenges to two South Carolina disorderly conduct statutes. *Id.* at 284. This Court explained that "there is a sufficiently imminent injury in fact if plaintiffs allege [1] 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [2] there exists a credible threat of prosecution thereunder.'" *Id.* at 288 (quoting *Babbitt v. Farm Workers Nat'l Union*, 442

14

U.S. 289, 298 (1979)).  The *Kenny* plaintiffs satisfied the first prong because they "attend school" and "attending school inevitably involves expressive conduct" that implicates the disorderly conduct statutes.  *Id.*  As to the second element—whether the students alleged a "credible threat of future enforcement"—we held that such a threat exists so long as it "is not imaginary or wholly speculative, chimerical, or wholly conjectural."  *Id.* (internal quotation marks, citations, and alterations omitted).  "[P]ast enforcement against the same conduct is good evidence that the threat of enforcement is not chimerical."  *Id.* (quoting *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2345 (2014)).  "Threat of prosecution is especially credible when defendants have not 'disavowed enforcement' if plaintiffs engage in similar conduct in the future."  *Id.* (quoting *Driehaus*, 134 S. Ct. at 2345).  Applying this standard, we held that the plaintiffs alleged a credible threat of enforcement "because these three plaintiffs regularly attend schools where they allege there may be future encounters with school resource officers or other law enforcement; they have been prosecuted under the laws in the past; and the defendants have not disavowed enforcement if plaintiffs engage in similar conduct in the future."  *Id.* at 289.

Under *Kenny*, Davison's evidence established his standing to obtain prospective declaratory relief.  Relevant to the first prong—whether Davison intends to engage in a course of conduct "arguably" impacted by the challenged conduct, *Babbitt*, 442 U.S. at 298—the district court found, in awarding Davison declaratory relief, that he "continues to avail himself" of the Chair's Facebook Page and that Davison is "active in local politics, and has a particular interest in what he believes to be corruption on the part of Loudoun County's school board."  *Davison*, 267 F. Supp. 3d at 707, 723.  Accordingly,

15

the evidence establishes that Davison continues to engage in a course of conduct—namely, posting about alleged municipal corruption on the Chair's Facebook Page—likely to be impacted by Randall's allegedly unconstitutional approach to managing the page.

Turning to the second prong—whether there is a credible threat of enforcement—Randall previously blocked Davison from the Chair's Facebook Page based on the content of his posts, providing "good evidence that the threat of enforcement is not chimerical." *Driehaus*, 134 S. Ct. at 2345 (internal quotation marks omitted). Additionally, Randall testified that she continues to believe she can ban Davison and others from the Chair's Facebook Page based on their views without triggering the First Amendment *at all*. *See* J.A. 277 (Randall stating she would "be happy to" ban other commenters on her "Chair's Facebook" page); J.A. 250 (Randall testifying that comments "attacking another person" would not be allowed on her "Chair's Facebook" page). To that end, in awarding Davison declaratory relief, the district court found that Randall "maintains she is permitted to administer this Facebook page as a purely personal page." *Davison*, 267 F. Supp. 3d at 723. Accordingly, Davison established that he has been subject to past enforcement and that Randall has not "disavowed" future enforcement, which, under *Kenny*, is sufficient to establish a credible threat of enforcement. *Cf. City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757 (1988) ("[T]he mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused.").

16

In sum, Davison's evidence demonstrated—and the district court found—that Davison intends to continue to use the Chair's Facebook Page and that Davison faces a credible threat of future enforcement. *See Davison*, 267 F. Supp. 3d at 723. Accordingly, Davison adduced facts establishing an injury in fact sufficient to justify the prospective declaratory relief awarded by the district court.

B.

Next, Randall asserts that the district court erred in concluding, with regard to Davison's individual capacity First Amendment claim, that Randall acted "under color of state law," as that phrase is used in Section 1983, in administering the Chair's Facebook Page and banning Davison from that page. "This Court reviews judgments stemming from a bench trial under a mixed standard: factual findings are reviewed for clear error, whereas conclusions of law are reviewed de novo." *Helton v. AT&T Inc.*, 709 F.3d 343, 350 (4th Cir. 2013). Whether, under the undisputed facts, Randall acted under color of state law is a legal question this Court reviews de novo. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003).

To state a claim under Section 1983, a plaintiff must show that the alleged constitutional deprivation at issue occurred because of action taken by the defendant "under color of . . . state law." *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299,

17

326 (1941)).  Section 1983's "color-of-law prerequisite is synonymous with the more familiar state-action requirement" applicable to Fourteenth Amendment claims, "and the analysis for each is identical."  *Pitt Cty. Mem'l Hosp.*, 572 F.3d at 180.  Both inquiries demand that "the conduct allegedly causing the deprivation of a federal right be fairly attributable to the State."  *Holly v. Scott*, 434 F.3d 287, 292 (4th Cir. 2006) (quoting *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982)).

"[T]here is no specific formula for determining whether state action is present."  *Id.* at 292 (internal quotation marks omitted).  Rather, "[w]hat is fairly attributable [to the state]"—i.e., what constitutes action under color of state law—"is a matter of normative judgment, and the criteria lack rigid simplicity."  *Id.* (internal quotation marks omitted).  Courts must examine the "totality of the circumstances," *id.* (internal quotation marks omitted), to determine if the action at issue "bore a 'sufficiently close nexus' with the State to be 'fairly treated as that of the State itself,'" *Rossignol*, 316 F.3d at 525 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)).

Although no one factor is determinative, this Court has held that a defendant's purportedly private actions bear a "sufficiently close nexus" with the State to satisfy Section 1983's color-of-law requirement when the defendant's challenged "actions are linked to events which arose out of his official status."  *Id.* at 524.  When a defendant's "status" as a public official "enabled [her] to execute [a challenged action] in a manner that private citizens never could have," then the action also is more likely to be treated as attributable to the state.  *Id.* at 526; *see also Martinez v. Colon*, 54 F.3d 980, 986 (1st Cir. 1995) ("[S]ection 1983 is . . . implicated . . . [when] the conduct is such that the actor

18

could not have behaved in that way but for the authority of his office."); *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 343 (4th Cir. 2000) (holding that challenged conduct is more likely to amount to state action when "the injury caused is aggravated in a unique way by the incidents of governmental authority" (internal quotation marks omitted)). Likewise, an official's conduct is more likely to amount to state action when it "occurs in the course of performing an actual or apparent duty of his office." *Martinez*, 54 F.3d at 986. And the challenged action of a defendant governmental official is likely to be treated as taken under color of law when the official "use[d] the power and prestige of his state office to damage the plaintiff." *Harris v. Harvey*, 605 F.2d 330, 337 (7th Cir. 1979). In the context of an alleged First Amendment violation, in particular, this Court has found that a challenged action by a governmental official is fairly attributable to the state when "the sole intention" of the official in taking the action was "to suppress speech critical of his conduct of official duties or fitness for public office." *Rossignol*, 316 F.3d at 524.

Here, after thoroughly analyzing the totality of the circumstances surrounding Randall's creation and administration of the Chair's Facebook Page and banning of Davison from that page, the district court concluded that Randall acted under color of state law. *Davison*, 267 F. Supp. 3d at 723. We agree.

Randall created and administered the Chair's Facebook Page to further her duties as a municipal official. She used the Chair's Facebook Page "as a tool of governance," *id.* at 713: through the Chair's Facebook Page, Randall provides information to the public

19

about her and the Loudoun Board's official activities and solicits input from the public on policy issues she and the Loudoun Board confront. *See supra* Part I.A.

For instance, Randall used the Chair's Facebook Page to inform the public about serious public safety events and to keep her constituents abreast of the County's response to a snowstorm and to coordinate snow removal activities. And, as the district court correctly emphasized, Randall

> swathe[d] the [Chair's Facebook Page] in the trappings of her office. Among other things, (1) the title of the page includes [Randall]'s title; (2) the page is categorized as that of a government official; (3) the page lists as contact information [Randall]'s official County email address and the telephone number of [Randall]'s County office; (4) the page includes the web address of [Randall]'s official County website; (5) many—perhaps most—of the posts are expressly addressed to "Loudoun," [Randall]'s constituents; (6) [Randall] has submitted posts on behalf of the [Loudoun Board] as a whole; (7) [Randall] has asked her constituents to use the [Chair's Facebook Page] as a channel for "back and forth constituent conversations"; and (8) the content posted has a strong tendency toward matters related to [Randall]'s office.

*Davison*, 267 F. Supp. 3d at 714. A private citizen could not have created and used the Chair's Facebook Page in such a manner. *Rossignol*, 316 F.3d at 526. Put simply, Randall clothed the Chair's Facebook Page in "the power and prestige of h[er] state office," *Harris*, 605 F.2d at 337, and created and administered the page to "perform[] actual or apparent dut[ies] of h[er] office," *Martinez*, 54 F.3d at 986.

Additionally, the specific actions giving rise to Davison's claim—Randall's banning of Davison's Virginia SGP Page—"are linked to events which arose out of h[er] official status." *Rossignol*, 316 F.3d at 524. Randall's post to the Chair's Facebook Page that prompted Davison's comment informed the public about what happened at the

20

Loudoun Board and Loudoun County School Board's joint meeting. And Davison's comment also dealt with an issue related to that meeting and of significant public interest—School Board members' alleged conflicts of interest in approving financial transactions. That Randall's ban of Davison amounted to an effort "to suppress speech critical of [such members'] conduct of [their] official duties or fitness for public office" further reinforces that the ban was taken under color of state law. *Id.* at 525. Considering the totality of these circumstances, the district court correctly held that Randall acted under color of state law in banning Davison from the Chair's Facebook Page.

C.

Third, Randall argues that the district court erred in ruling in Davison's favor on his individual capacity First Amendment claim against Randall. Randall principally challenges the district court's conclusion that the Chair's Facebook Page constitutes a "public forum" under traditional First Amendment law. We review this legal question de novo. *See Helton*, 709 F.3d at 350.

Under long-established First Amendment law, governmental entities are "strictly limited" in their ability to regulate private speech in public fora. *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009). The Supreme Court has recognized two categories of public fora: "traditional public forums" and "limited (or designated) public forums." *Am. Civil Liberties Union v. Mote*, 423 F.3d 438, 443 (4th Cir. 2005). "Traditional" public forums—"such as streets, sidewalks, and parks"—"have the characteristics of a public thoroughfare, a purpose that is compatible with expressive conduct, as well as a tradition and history of being used for expressive public conduct."

21

*Id.* "Limited" or "designated" forums are forums that are "not traditionally public, but [that] the government has purposefully opened to the public, or some segment of the public, for expressive activity." *Id.* Accordingly, the hallmark of both types of public fora—what renders the fora "public"—is that the government has made the space available—either by designation or long-standing custom—for "expressive public conduct" or "expressive activity," and the space is compatible with such activity. *Id.* "Conversely, a non-public forum is one that has not traditionally been open to the public, where opening it to expressive conduct would 'somehow interfere with the objective use and purpose to which the property has been dedicated.'" *Id.* (quoting *Warren v. Fairfax Cty.*, 196 F.3d 186, 190–91 (4th Cir. 1999)).

Although neither the Supreme Court nor any Circuit has squarely addressed whether, and in what circumstances, a governmental social media page—like the Chair's Facebook Page—constitutes a public forum,[3] aspects of the Chair's Facebook Page bear the hallmarks of a public forum. Randall "intentionally open[ed the public comment section of the Chair's Facebook Page] for public discourse," *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985), inviting "ANY Loudoun citizen"

---

[3] In addition to the court below, two other district courts have considered whether a government official's social media page constituted a public forum. Those courts reached conflicting results. *Compare Morgan v. Bevin*, 298 F. Supp. 3d 1003, 1010 (E.D. Ky. 2018) (holding that First Amendment forum analysis did not apply to restrictions on speech in the official Facebook and Twitter pages of the Governor of Kentucky), *with Knight First Amend. Inst. at Colum. Univ. v. Trump*, 302 F. Supp. 3d 541, 573 (S.D.N.Y. 2018) (holding that the *interactive component* of the President's Twitter account, as opposed to the President's tweets themselves, constituted a designated public forum), *appeal docketed*, No. 18-1691 (2d Cir. Oct. 24, 2018).

to make posts to the comments section of the Chair's Facebook Page—the interactive component of the page—"on ANY issues, request, criticism, complement or just your thoughts," J.A. 455. Randall placed no restrictions on the public's access to the page or use of the interactive component of the Chair's Facebook Page. And, in accordance with Randall's invitation, the public made numerous posts on matters of public concern.

The Chair's Facebook Page also is "compatib[le] with expressive activity." *Cornelius*, 473 U.S. at 802. "Congress [has] recognized the internet and interactive computer services as offering 'a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.'" *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997) (quoting 47 U.S.C. § 230(a)(3)); *cf. Bland*, 730 F.3d at 386 (finding post to campaign Facebook page "constituted pure speech"). And the Supreme Court recently analogized social media sites, like the Chair's Facebook Page, to "traditional" public forums, characterizing the internet as "the most important place[] (in a spacial sense) for the exchange of views." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017). An "exchange of views" is precisely what Randall sought—and what in fact transpired—when she expressly invited "ANY Loudoun citizen" to visit the page and comment "on ANY issues," and received numerous such posts and comments. J.A. 455.

Randall nevertheless argues that traditional public forum analysis should not apply to the Chair's Facebook Page for two reasons: (1) the Chair's Facebook Page is "a private website" and therefore does not constitute "public property" susceptible to forum analysis, and (2) the Chair's Facebook Page, in its entirety, constitutes "government

23

speech" properly analyzed under the framework set forth in *Pleasant Grove*. Randall's Br. at 19–21, 29–31. We disagree.

Even assuming the intangible space at issue is "private property," as Randall claims—which is not at all clear from the record before us[4]—the Supreme Court never has circumscribed forum analysis solely to government-owned property. For example, in *Cornelius*, the Court recognized that forum analysis applies "to *private property dedicated to public use*." *Cornelius*, 473 U.S. at 801 (emphasis added); *see also Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 679 (2010) ("[T]his Court has employed forum analysis to determine when a governmental entity, in regulating *property in its charge*, may place limitations on speech." (emphasis added)).

---

[4] The Facebook "platform" and the "software" that underlies that platform is, according to Facebook's *Terms of Service*, property of Facebook, Inc. *Terms of Service*, Facebook, https://www.facebook.com/terms.php (last visited Jan. 4, 2019). Facebook's *Terms of Service* further provide that *users* "own the content [they] create and share on Facebook and the other Facebook Products," including Pages. *Id.* There would seem to be a good argument, therefore, that content created, and posted to Facebook, by government officials performing the functions and duties of their offices constitutes government property. *Cf. Solomons v. United States*, 137 U.S. 342, 346–48 (1890) (holding that intellectual property created by government employee in the course of his official duties constituted government property because "[i]f one is employed to devise or perfect an instrument, or a means for accomplishing a prescribed result, he cannot, after successfully accomplishing the work for which he was employed, plead title thereto as against his employer"). Likewise, under Facebook's *Terms of Service*, the posts and comments by individual Facebook users—like Davison—to a Facebook Page—like the Chair's Facebook Page—constitute property of those users. Accordingly, a single Facebook Page—including the Chair's Facebook Page—encompasses a web of property rights, some of which may lie with the government. We need not—and thus do not—decide with whom these property rights lie in this particular case, however, because we hold that even assuming the Chair's Facebook Page constitutes private property, Randall, acting under color of state law, exercised control over the aspects of that page giving rise to Davison's claim.

And the Supreme Court and lower courts have held that private property, whether tangible or intangible, constituted a public forum when, for example, the government retained substantial control over the property under regulation or by contract. *See, e.g.*, *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 547, 555 (1975) (holding that "a privately owned Chattanooga theater under long-term lease to the city" was a "public forum[] designed for and dedicated to expressive activities"); *Halleck v. Manhattan Community Access Corp.*, 882 F.3d 300, 306–07 (2d Cir. 2018) (holding that public access television channels operated by a private non-profit corporation constituted public forums), *cert. granted* 139 S. Ct. 360 (2018) (mem.); *First Unitarian Church of Salt Lake City v. Salt Lake City Corp.*, 308 F.3d 1114, 1122 (10th Cir. 2002) ("[F]orum analysis does not require that the government have a possessory interest in or title to the underlying land. Either government ownership or regulation is sufficient for a First Amendment forum of some kind to exist."); *Freedom from Religion Foundation, Inc. v. City of Marshfield, Wis.*, 203 F.3d 487, 494 (7th Cir. 2000) (holding that private property abutted by public park constituted public forum).

Significantly, even assuming the relevant aspects of the Chair's Facebook Page constitute private property—which, again, is not entirely clear from the record before us—Randall, acting under color of state law, retained and exercised significant control over the page. She created the Chair's Facebook Page. She designated the page as belonging to a "governmental official." She clothed the page in the trappings of her public office. She chose to list her official contact information on the page. And she

25

curated the links in the left column of the page and the lists of Facebook Pages or profiles "liked" by the Chair's Facebook Page in the right column.

Of particular importance, Randall had complete control over the aspect of the Chair's Facebook Page giving rise to Davison's challenge because, as administrator of the page, Randall had authority to ban Facebook profiles or Pages from using the Chair's Facebook Page—and, therefore, the interactive component of the page—authority she exercised in banning Davison's Virginia SGP Page. *Cf. Knight*, 302 F. Supp. 3d at 566–67 (holding that the interactive component of the President's Twitter account constituted public forum because the President and his advisors "exercise control over various aspects of the . . . account," including the power to block other users from accessing the account).

The Second Circuit's decision in *Halleck* dealing with privately operated public access television channels is instructive. Federal law allows cable franchising authorities to require cable operators to designate channel capacity for public use. *Halleck*, 882 F.3d at 302. Likewise, New York regulations oblige cable operators to designate at least one channel for full-time public use. *Id.* Pursuant to that authority, the City of New York entered into a cable franchise agreement with a cable company requiring the company to make available four public access channels, which channels were operated by a private, non-profit corporation, MNN. *Id.* Several producers of public access programming sued MNN, alleging that MNN violated the producers' First Amendment rights by indefinitely suspending them from using the public access channels "because of disapproval of the content of a TV program" they had submitted for airing. *Id.*

26

The Second Circuit concluded that the public access channels constituted a public forum, notwithstanding that they were operated by a private company. *Id.* at 306–08. The court reached that conclusion for two reasons. First, it pointed to the similarities between public access channels and traditional public forums, like parks, describing "[a] public access channel [a]s the electronic version of the public square." *Id.* at 306. Second, the court emphasized the extensive government involvement with, and control over, public access channels by virtue of the federal and state regulatory schemes. *See id.* ("[W]here, as here, federal law authorizes setting aside channels to be 'the electronic marketplace of ideas,' state regulation requires cable operators to provide at least one public access channel, a municipal contract requires a cable operator to provide four such channels, *and a municipal official has designated a private corporation to run those channels*, those channels are public forums." (emphasis added)).

Although not subject to the extensive federal and state regulatory regime applicable in *Halleck*,[5] the Chair's Facebook Page is in many ways analogous to the privately-operated public access channels considered by the Second Circuit. Just as the federal government sought to establish an "electronic marketplace of ideas" by mandating provision of public access channels, Randall expressly sought to—and did, in

---

[5] The federal Communications Decency Act allows private online intermediaries, like Facebook, the ability to moderate content by providing such intermediaries with broad immunity from user-generated content posted on their sites. 47 U.S.C. § 230. This Court has recognized that an "important purpose of § 230 was to encourage service providers to self-regulate the dissemination of offensive material over their services." *Zeran*, 129 F.3d at 331.

fact—create an "electronic marketplace of ideas" by inviting "ANY" constituent to post to the Chair Page on "ANY issues." J.A. 455. Likewise, just as the City of New York chose to have a private corporation operate the public access channels, Randall chose to create her electronic marketplace of ideas, the Chair's Facebook Page, on a private platform, Facebook. Indeed, the present case provides a stronger basis for treating the interactive component of the Chair's Facebook Page as a public forum because whereas the private corporation in *Halleck*, MNN, exercised control over the aspect of the public access channel giving rise to the First Amendment claim—banning the public access program producer—a public official, Randall exercised unconstrained control over the aspect of the Chair's Facebook Page giving rise to Davison's claim—banning of other Facebook profiles and Pages.[6]

---

[6] On October 12, 2018, the Supreme Court granted MNN's petition for writ of certiorari in *Halleck*. 139 S. Ct. 360. MNN's petition presented two questions: (1) "[w]hether the Second Circuit erred in rejecting th[e Supreme] Court's state actor tests and instead creating a *per se* rule that private operators of public access channels are state actors subject to constitutional liability" and (2) "[w]hether the Second Circuit erred in holding—contrary to the Sixth and D.C. Circuits—that private entities operating public access televisions stations are state actors for constitutional purposes where the state has no control over the private entity's board or operations." Petition for Writ of Certiorari i, *Manhattan Community Access Corp. v. Halleck*, --- S. Ct. --- (No. 17-1702). MNN's argument before the Supreme Court, therefore, focuses on the Second Circuit's determination that MNN constituted a state actor, not the court's determination that the public access channels constituted a public forum.

Although not identified as an issue on appeal, MNN's petition also took issue with the Second Circuit's determination that the public access channels operated by MNN constituted a public forum. But that contention was entirely derivative of its state action argument. In particular, MNN objected to the Second Circuit's public forum conclusion *only* because the public access channels were *privately operated* and because, in its opinion, the Second Circuit's purportedly "categorical" holding that public access
(Continued)

28

Not only does case law contradict Randall's argument that public forum analysis never applies to private property, her argument also fails because it makes no legal sense to establish a bright-line rule that forum analysis applies only to government-owned property. Why, for example, should the First Amendment allow a municipality to engage in viewpoint discrimination in curating a public library branch in leased space but not allow the municipality to engage in such discrimination in a library branch on municipally owned property? *Cf. Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 870–71 (1982) (plurality op.) ("If a Democratic school board, motivated by partisan affiliation, ordered removal of all books written by or in favor of Republicans, few would doubt that the order violated the constitutional rights of the students denied access to those books."). Or why should a municipality be allowed to engage in viewpoint discrimination when holding a virtual public meeting hosted on a private website when such discrimination would be unconstitutional if the meeting was held in a governmental building? *Cf.* Lyrissa Lidsky, *Public Forum 2.0*, 91 B.U. L. Rev. 1975, 1996 (2011) ("Just as the government can rent a building to use as a forum for public debate and discussion, so, too, can it 'rent' a social media page for the promotion

channels constitute public forums ignore[d] "the far more critical issue of whether (and to what extent) there is government control over a public access channel." *Id.* at 19–20.

Here, a *government official acting under color of state law*, Randall, exercised unconstrained control over the aspect of the Chair's Facebook Page giving rise to Davison's claim.

29

of public discussion."). We do not believe the First Amendment draws such arbitrary lines.

Randall's second argument—that the Chair's Facebook Page amounts to "government speech"—fails to recognize the meaningful difference between Randall's posts to the Chair's Facebook Page and the public comments and posts she invited in the page's interactive space. To be sure, Randall's comments and curated references on the Chair's Facebook Page to other Pages, personal profiles, and websites amount to governmental speech. *See Sutliffe v. Epping School Dist.*, 584 F.3d 314, 329–30 (1st Cir. 2009) (holding that municipality's refusal to place hyperlink on municipal website to website of group opposed to municipal budget constituted government speech); *Page v. Lexington Cty. School Dist. One*, 531 F.3d 275, 283–85 (4th Cir. 2008) (holding that School District's refusal to place hyperlink on its website to website of group that opposed School District's position on pending legislation constituted government speech because, in part, "the links to other websites were selected by the School District alone as ones that supported *its own message*"); *Knight*, 302 F. Supp. 3d at 571 ("[T]he President's tweets are [not] susceptible to forum analysis . . . because the content is government speech.").

But the interactive component of the Chair's Facebook Page—the portion of the middle column in which the public can post comments, reply to posts, and "like" comments and posts—is materially different. *See Knight*, 302 F. Supp. 3d at 572 (distinguishing a government official's tweets and "the interactive space for replies and retweets"). Randall placed no formal limitations on the ability of Facebook personal

profiles and Pages to access the Chair's Facebook Page and make comments and posts to the interactive component of the page. On the contrary, she expressly invited posts to the page "from ANY Loudon citizen on ANY issues, request, criticism, complement or just your thoughts." J.A. 455. And comments and posts by users cannot be mistaken for Randall's own speech because they identify the posting or replying personal profile or Page, and thereby distinguish that user from Randall.

Contrary to Randall's argument that the Chair's Facebook Page, in its entirety, amounts to government speech, the present case also is meaningfully distinguishable from the government speech framework identified in *Pleasant Grove*. There, a municipality denied a private religious group's request to allow it to erect a "monument in a city park in which other donated monuments were previously erected," including a monument depicting a prominent symbol of a different religion. 555 U.S. at 464. The plaintiff religious group sought relief under the First Amendment, arguing that the city park constituted a traditional public forum, and therefore that the city could not reject the religious group's proposed monument when it had previously allowed construction of a monument associated with another religion. *Id.* at 466.

The Supreme Court held that the city did not violate the First Amendment because the government speech framework, rather than forum analysis, applied to the conduct at issue. In reaching that conclusion, the Court emphasized that the city never "opened up the Park for the placement of whatever permanent monuments might be offered by private donors." *Id.* at 472–73. "Rather, the City has 'effectively controlled' the messages sent by the monuments in the Park by exercising 'final approval authority' over

31

their selection." *Id.* at 473. The Court further emphasized that "[t]he forum doctrine has been applied in situations in which government-owned property or a government program was capable of accommodating a large number of public speakers without defeating the essential function of the land or the program." *Id.* at 478. A city park, however, "can accommodate only a limited number of permanent monuments," and therefore a municipality cannot—and need not—provide park space for all who wish to erect a monument. *Id.*

Here, Randall "effectively controlled" certain aspects of the Chair's Facebook Page: she curated the Chair's Facebook Page's left and right columns and made posts to the middle column. *Id.* at 472. But Randall also expressly opened the Chair's Facebook Page's middle column—its interactive space—for "ANY" user to post on "ANY issues," J.A. 455, and therefore did not retain "final approval authority" over that aspect of the Chair's Facebook Page, *Pleasant Grove*, 555 U.S. at 473. Just as the parkland surrounding monuments in *Pleasant Grove* continued to constitute a public forum, even though the monuments themselves constituted government speech, so too the interactive component of the Chair's Facebook Page constitutes a public forum, even though Randall's curation of and posts to the Chair's Facebook Page amount to government speech. Additionally, the interactive component of the Chair's Facebook Page does not face the same spacial limitations as those of the park in *Pleasant Grove*, but instead is "capable of accommodating a large number of public speakers without defeating [its] essential function." *Id.* at 578. Accordingly, *Pleasant Grove* supports, rather than

32

undermines, our conclusion that the interactive component of the Chair's Facebook Page constitutes a public forum.

Upon concluding that interactive component of the Chair's Facebook Page amounts to a public forum, we would normally need to determine whether it constitutes a traditional public forum or designated or limited public forum. In the present case, however, we need not decide that question because Randall's ban of Davison amounted to "viewpoint discrimination," which is "prohibited in all forums." *See Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*, 470 F.3d 1062, 1067 n.2 (4th Cir. 2006). "Viewpoint discrimination . . . 'targets not subject matter, but particular views taken by speakers on a subject.'" *Id.* (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). Viewpoint discrimination is apparent, for example, if a government official's decision to take a challenged action was "impermissibly motivated by a desire to suppress a particular point of view." *Cornelius*, 473 U.S. at 812–13.

Here, the district court found—as the record amply supports—that Randall banned Davison's Virginia SGP Page because Davison posted a comment using that page alleging "corruption on the part of Loudoun County's School Board involving conflicts of interests among the School Board and their family members." *Davison*, 267 F. Supp. 3d at 711. Although Randall stated that she had "no idea" whether Davison's allegations were "correct," she nonetheless banned him because she viewed the allegations as "slanderous" and she "didn't want [the allegations] on the site." *Id.* at 717. Randall's decision to ban Davison because of his allegation of governmental corruption constitutes black-letter viewpoint discrimination.

33

Put simply, Randall unconstitutionally sought to "suppress" Davison's opinion that there was corruption on the School Board. *Cornelius*, 473 U.S. at 812–13; *see also, e.g.*, *Rossignol*, 316 F.3d at 521 (holding that sheriff's deputies engaged in viewpoint discrimination when they seized an issue of a newspaper that criticized the county sheriff's and his deputies' performance of their official duties); *Putnam Pit, Inc. v. City of Cookeville, Tenn.*, 221 F.3d 834, 846 (6th Cir. 2000) (holding that a municipality engages in viewpoint discrimination if it refuses to link newspaper webpage to the city's website solely because the newspaper sought to expose municipal corruption); *Knight*, 302 F. Supp. 3d at 575 (holding that the President engaged in viewpoint discrimination when he blocked individuals from his Twitter account because the individuals "posted tweets that criticized the President or his policies").[7] That Randall's action targeted comments critical of the School Board members' official actions and fitness for office renders the banning all the more problematic as such speech "occupies the core of the protection afforded by the First Amendment." *Rossignol*, 316 F.3d at 521 (quoting *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995)).

In sum, the interactive component of the Chair's Facebook Page constituted a public forum, and Randall engaged in unconstitutional viewpoint discrimination when she banned Davison's Virginia SGP Page from that forum.

---

[7] Randall also asserts that she did not violate Davison's First Amendment rights because she banned his "Virginia SGP" Page, not his "Brian Davison" profile. Davison is the sole operator of the "Virginia SGP" Page, however, and therefore the ban implicated *his* First Amendment rights. Randall fails to identify any case supporting her position, nor have we found any. Accordingly, we reject this argument.

34

III.

In his cross-appeal, Davison asserts that the district court reversibly erred in two ways: (A) by dismissing his claim against Randall in her official capacity and (B) by denying his motion to amend his complaint to add the new First Amendment claim against the Loudoun Board.[8] We disagree.

A.

Davison first argues that the district court erred in dismissing his claim against Randall in her official capacity. Whereas "[p]ersonal-capacity suits seek to impose personal liability upon a government official for actions [she] takes under color of state law," *Kentucky v. Graham*, 473 U.S. 159, 165 (1985), "official capacity suits are 'treated as suits against the municipality,'" *Santos v. Frederick Cty. Bd. of Comm'rs*, 725 F.3d 451, 469 (4th Cir. 2013) (quoting *Hafer v. Melo*, 502 U.S. 21, 25 (1991)). Because "municipal liability under Section 1983 does not amount to respondeat superior . . . a

___

[8] Davison also argues that the district court erred in rejecting his procedural due process claims under the Fourteenth Amendment and an analogous provision in the Virginia Constitution. Before the district court, Davison "flatly asserted that due process *always* requires the government to provide a hearing before imposing a prior restraint on speech," and therefore that Randall violated Davison's First Amendment rights by failing to conduct a pre-ban hearing. *Davison*, 267 F. Supp. 3d at 719. The district court correctly rejected Davison's proposed categorical rule. *Id.* (citing *Cafeteria & Rest. Workers Union Local 473, AFL-CIO v. McElroy*, 367 U.S. 886, 895 (1961). And Davison has abandoned that asserted categorical rule on appeal, Davison's Br. at 49–50 n.19 ("[I]t might be permissible in certain contexts to delete an individual comment without providing full pre-deprivation process . . . ."), instead arguing he is entitled to relief under the balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976). Because Davison did not make that argument before the district court, we decline to consider it now. *See CoreTel Va., LLC v. Verizon Va., LLC*, 808 F.3d 978, 988 (4th Cir. 2015).

municipality is subject to Section 1983 liability only when its 'policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [plaintiff's] injury.'" *Id.* at 469–70 (quoting *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 694 (1978)).

Here, the district court dismissed Davison's official capacity claim because it found that "no policy—whether County-wide or specific to [Randall]'s office—played any role in [Randall]'s decision to ban [Davison] from her [Chair's Facebook Page]." *Davison*, 267 F. Supp. 3d at 715. We review the district court's factual findings bearing on whether Randall acted pursuant to a municipal policy or custom for clear error and its legal conclusions de novo. *Helton*, 709 F.3d at 350.

On appeal, Davison does not dispute the district court's finding—which the record amply supports—that Loudoun County did not promulgate a policy governing individual Loudoun Board members' Facebook pages. Rather, Davison principally[9] argues that "the county can be held liable for Randall's actions because in banning Davison, Randall acted as a municipal policymaker." Davison's Br. at 47.

---

[9] Davison also argues the Loudoun Board's failure to adopt a policy pertaining to individual board members' Facebook pages gives rise to an official capacity claim because it establishes that the Loudoun "Board was—and remains—deliberately indifferent to the likelihood of unconstitutional censorship and viewpoint-based discrimination on individual supervisors' social media sites." Davison's Br. at 46. But Davison never advanced a "deliberate indifference" theory of municipal liability before the district court. Again, we decline to consider an argument Davison raises for the first time on appeal. *See CoreTel, LLC*, 808 F.3d at 988.

36

Davison is correct that "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Hunter v. Town of Mocksville, N.C.*, 897 F.3d 538, 554 (4th Cir. 2018) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)). "[I]n assessing whether a municipality may be held liable for constitutional or statutory violations of their decisionmakers, the touchstone inquiry is whether 'the decisionmaker possesses *final authority to establish municipal policy with respect to the action ordered*.'" *Id.* at 554–55 (emphasis added) (quoting *Liverman v. City of Petersburg*, 844 F.3d 400, 413 (4th Cir. 2016)).

Here, Davison failed to put forward evidence establishing that Randall was a final municipal policymaker with regard to her banning of Davison from the Chair's Facebook Page. On the contrary, record evidence establishes that the Loudoun Board retained authority to establish municipal policy with respect to social media pages, as it adopted a social media policy governing the County's official social media pages. Davison concedes as much, arguing that the Loudoun Board "neglected . . . to extend its written guidelines to Board members' official pages." Davison's Br. at 46. But that argument presupposes that the Loudoun Board—not Randall—had authority to establish municipal policy with respect "to Board members' official pages."

Davison nevertheless argues that the Loudoun Board "implicitly" delegated its final policymaking authority to Randall by not addressing individual Loudoun Board members' official pages in its social media policy. Davison is correct that delegation of final policy making authority may be "implied from a continued course of knowing acquiescence by the governing body in the exercise of policymaking authority by an

37

agency or official." *Id.* at 48 (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987)). But Davison identifies no evidence that the Loudoun Board knew of the Chair's Facebook Page, let alone that it "aquiesce[d]" in Randall's administration of the page and banning of Davison, in particular. On the contrary, the district court found that Randall made a one-off, "unilateral decision to ban [Davison] in the heat of the moment, and reconsidered soon thereafter," *Davison*, 267 F. Supp. 3d at 715—before the Loudoun Board had a chance to learn of her action. In such circumstances, the district court did not reversibly err in rejecting Davison's official capacity claim.

B.

Next, Davison argues that the district court erred in denying him leave to amend his complaint to add a claim that "the County violates the First Amendment by maintaining a limited public forum on Facebook," when policies imposed by Facebook, rather than the County, restrain, or have the potential to restrain, speech. J.A. 74. "A district court may deny a motion to amend when the amendment would be prejudicial to the opposing party, the moving party has acted in bad faith, or the amendment would be futile." *Equal Rights Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 603 (4th Cir. 2010). The magistrate judge recommended—and the district court agreed—that Davison be denied leave to amend on grounds of both futility and prejudice. We review for abuse of discretion a district court's denial of leave to amend for prejudice, whereas we review de novo a district court's denial of leave to amend on the basis of futility. *See U.S. ex rel. Ahumada v. NISH*, 756 F.3d 268, 274 (4th Cir. 2014).

38

Regarding prejudice, the district court determined that the amendment came "too late in these proceedings" and would "add a new, novel legal theory to the case after the close of discovery, after the existing claims against [the Loudoun Board] have been shown to be meritless, after the point at which Defendants could have addressed the claim in briefing before trial, and on the eve of trial." J.A. 74. The district court did not abuse its discretion in denying leave to amend in such circumstances. *See, e.g.*, *Equal Rights Ctr.*, 602 F.3d at 603–04 (holding that district court did not abuse its discretion in denying leave to amend on the basis of prejudice when amendment came after the close of discovery and "on the eve of the deadline for dispositive motions" and therefore "would [have] change[d] the nature of the litigation"); *Deasy v. Hill*, 833 F.2d 38, 41 (4th Cir. 1987) (affirming denial of leave to amend on grounds of prejudice when "the motion to amend came right before trial and after discovery was complete").

Although we affirm the district court's judgment on the basis of its finding of prejudice, we do not concur in its conclusion as to futility. "Futility is apparent if the proposed amended complaint fails to state a claim under the applicable rules and accompanying standards." *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011). Accordingly, Davison's proposed amendment was futile if the new claim would not have survived a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Ind.*, 786 F.3d 510, 524 (7th Cir. 2015) ("[W]hen the basis for denial is futility, we apply the legal sufficiency standard of Rule 12(b)(6) to determine whether the proposed amended complaint fails to state a claim.").

Davison's proposed First Amendment claim deals not with the Chair's Facebook Page—which the Loudoun Board did not authorize or attempt to regulate—but rather with Loudoun County's official Facebook Pages created and maintained pursuant to the Loudoun Board's social media policy. As with his claims related to the Chair's Facebook Page, Davison alleged that the Facebook Pages created and maintained by the Loudoun Board constituted public forums subject to the First Amendment. Davison theorized that the Loudoun Board's decision to use Facebook as its social media forum violated his First Amendment rights because *Facebook rules* permit individual "requesting" users to ban other personal profiles and Pages such that the banned users can no longer see posts authored by the requesting users. In such circumstances, the banned users "cannot see [the requesting user's] comment[s] or participate in the discussion surrounding the [requesting] party's comment." Davison's Br. at 59. Davison's proposed amended complaint asserted that "this scenario violates the First Amendment because Loudoun County has effectively enabled third parties to exclude discussion within a public forum—something a government body could not permissibly do in a physical forum." *Id.* at 59–60 (internal citation omitted). Put differently, Davison theorized that Loudoun County violated the First Amendment by choosing to use Facebook as a public forum, when *rules imposed by Facebook* allow private users to restrict access to their posts—and comments on and responses to those posts—including posts to any municipal Facebook Page.

No court appears to have addressed that novel legal theory. And although the First Amendment constrains only government policies, not policies established by private

40

entities, one can conceive of a colorable legal argument that a governmental actor's decision to select a private social media website for use as a public forum—and therefore select that website's suite of rules and regulations—could violate the First Amendment, if the private website included certain types of exclusionary rules. For example, if the government chose as its electronic public forum a social media site that allowed only registered members of one political party to post and comment, there would seem to be a compelling argument that the government's selection of that social media site violated the First Amendment rights of members of other political parties, even if the partisan restriction was imposed by the private company, not the governmental body. Such a restriction would be seem to be no different than a municipality choosing to hold a town hall meeting in a venue that refused admission to individuals associated with a disfavored political party or viewpoint. *Cf. DeBoer v. Village of Oak* Park, 267 F.3d 558, 571 (7th Cir. 2001) ("[T]he government engages in viewpoint discrimination when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject.").

Given that Davison's proposed claim asserted a novel and colorable legal theory and that "Rule 12(b)(6) dismissals are especially disfavored in cases where the complaint sets forth a novel legal theory that can best be assessed after factual development," *Wright v. North Carolina*, 787 F.3d 256, 263 (4th Cir. 2015) (internal quotation marks omitted), we affirm the district court's denial of Davison's motion for leave to amend his complaint on the basis of its finding of prejudice but not on the basis of futility.

IV.

41

For the foregoing reasons, we affirm the judgment of the district court.

*AFFIRMED*

BARBARA MILANO KEENAN, Circuit Judge, concurring:

I join the well-reasoned majority opinion in full. I agree that the central "aspects of the Chair's Facebook Page bear the hallmarks of a public forum." I am particularly persuaded by the facts concerning Randall's conduct of impressing the Chair Facebook Page with the trappings of a "government official" Facebook Page and of inviting citizens to comment, without restriction, on matters of public concern. Accordingly, under our precedent, I agree that Randall's conduct of banning Davison's Virginia SGP Page based on the content of a comment is attributable to the government and violates the First Amendment. *See Rossignol v. Voorhaar*, 316 F.3d 516, 523-25 (4th Cir. 2003).

I nonetheless write separately to call attention to two issues regarding governmental use of social media that do not fit neatly into our precedent. First, I question whether any and all public officials, regardless of their roles, should be treated equally in their ability to open a public forum on social media. The Supreme Court recently cited a series of decisions in which "a *unit* of government" had created a public forum. *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017) (emphasis added) (citing cases); *see also Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009) ("a government *entity* may create a forum" (emphasis added)). However, it appears to be an open question whether an individual public official serving in a legislative capacity qualifies as a unit of government or a government entity for purposes of her ability to open a public forum. Instead, our precedent merely directs us to consider whether the challenged action "bore a sufficiently close nexus" with the government to be "fairly treated" as that of the

government itself. *Rossignol*, 316 F.3d at 525 (internal quotation marks and citation omitted).

The nature and extent of a public official's authority should have some bearing on the official's ability to open a public forum on social media. While the nine-member Loudoun County Board of Supervisors (the Board) serves to set policies, adopt ordinances, and appropriate funds, the Chair simply is empowered individually to oversee meetings and to set agendas.[1] The record before us is silent regarding the Chair's authority to take any official action on her own.

In contrast, certain elected executive officials, under given circumstances, can conduct government business and set official policy unilaterally, including through the use of social media. *See, e.g., Knight First Amendment Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 567 (S.D.N.Y. 2018) (discussing President Donald J. Trump's use of his Twitter account to appoint and remove officers and conduct foreign policy), *appeal docketed*, No. 18-1691 (2d Cir. Oct. 24, 2018); *Schisler v. State*, 907 A.2d 175, 218-20 (Md. 2006) (describing the governor's unilateral power to remove certain officers). The relevance of such distinctions to a public official's ability to create a public forum on social media is a matter that should be addressed by the Supreme Court. Because this is an open question, we are bound by current precedent and, for the reasons set forth in the

---

[1] *See Bd. of Supervisors Operations Manual*, LOUDOUN CTY., VA chs. 2-3, *https://www.loudoun.gov/DocumentCenter/View/117084/Board-of-Supervisors-Operations-Manual-2016-2020* (last visited Dec. 20, 2018) (saved as ECF opinion attachment).

majority opinion, Randall as a single board member acted under of color of law and opened a public forum on Facebook.

Second, the Supreme Court should consider further the reach of the First Amendment in the context of social media. I acknowledge that the Supreme Court has referred to social media as "the modern public square," *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017), implying that First Amendment principles protecting speech from government intrusion do extend to social media. However, the interplay between private companies hosting social media sites and government actors managing those sites necessarily blurs the line regarding which party is responsible for burdens placed on a participant's speech.

For example, hate speech is protected under the First Amendment. *See Matal*, 137 S. Ct. at 1763-64 (holding that the disparagement clause of the Lanham Act violated the First Amendment free speech clause because it prohibited hate speech). But social media companies like Facebook and others have policies forbidding hate speech on their platforms.[2] Thus, while a government official, who under color of law has opened a public forum on a social media platform like Facebook, could not ban a user's comment containing hate speech, that official could report the hate speech to Facebook. And Facebook personnel could ban the user's comment, arguably circumventing First Amendment protections.

---

[2] *See, e.g.*, *Cmty. Standards, Hate Speech*, FACEBOOK, *https://www.facebook.com/communitystandards/hate_speech* (last visited Dec. 20, 2018) (saved as ECF opinion attachment).

45

Admittedly, this question is not directly presented in the present case, given that the public official, not a Facebook employee, acted to restrict speech. Nonetheless, cases necessarily will arise requiring courts to consider the nuances of social media and their various roles in hosting public forums established by government officials or entities. Therefore, in my view, courts must exercise great caution when examining these issues, as we await further guidance from the Supreme Court on the First Amendment's reach into social media.