**[J-65-2024]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| PENNCREST SCHOOL DISTRICT, | : | No. 31 WAP 2023 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Commonwealth Court entered April |
| | : | 24, 2023, at No. 1463 CD 2021, |
| v. | : | Vacating the Order of the Court of |
| | : | Common Pleas of Crawford County |
| | : | entered December 16, 2021, at No. |
| THOMAS CAGLE, | : | AD 2021-486, and Remanding. |
| | : | |
| Appellant | : | ARGUED:  October 9, 2024 |

**<u>OPINION</u>**

**JUSTICE MUNDY**                                **DECIDED:  AUGUST 19, 2025**

The Right–to–Know Law ("RTKL" or "the law")[1] provides generally a specific set of procedures for accessing public records in Pennsylvania.  Although defined within the statute*,* due to the ever-evolving nature of technology and related new methods of communication, courts in this Commonwealth have been repeatedly tasked with discerning whether certain information is considered a record subject to disclosure.  Along these lines, in this appeal by allowance, we consider the propriety of the Commonwealth Court's decision to vacate the trial court's order compelling disclosure of Facebook[2] posts authored by members of a local school board.

---

[1] *See* Act of February 14, 2008, P.L. 6, No. 3, 65 P.S. §§ 67.101–67.3104.

[2] "Facebook is a social networking website.  Users of that [website] may post items on their Facebook page that are accessible to other users, including Facebook 'friends' who are notified when new content is posted."  *Carr v. Dep't of Transportation*, 230 A.3d 1075, (continued…)

# I. LEGAL BACKGROUND

"The RTKL is designed to promote access to official government information in order to prohibit secrets, scrutinize the actions of public officials, and make public officials accountable for their actions." *McKelvey v. Pennsylvania Dep't of Health*, 255 A.3d 385, 400 (Pa. 2021) (citation and internal quotation marks omitted). Consistent with this lofty goal, it is well-settled that "the law must be construed to maximize access to public records that are in an agency's possession." *Id.* *See also id.* ("[B]ecause the law is remedial legislation, and encourages the maximization of disclosure, the exemptions from disclosure must be strictly construed.").

"Upon receipt of a written request for access to a record, an agency shall make a good faith effort to determine if the record requested is a public record . . . and whether the agency has possession, custody or control of the identified record[.]" 65 P.S. § 67.901. Under the RTKL, a public record is, *inter alia*, a record of a Commonwealth or local agency. *See* 65 P.S. § 67.102. A "record" is defined as

> [i]nformation, regardless of physical form or characteristics, that documents a transaction or activity of an agency and that is created, received or retained pursuant to law or in connection with a transaction, business or activity of the agency. The term includes a document, paper, letter, map, book, tape, photograph, film or sound recording, information stored or maintained electronically and a data-processed or image-processed document.

*Id.*

This definition contains two parts. "First, the information must document a transaction or activity of an agency. . . . Second, the information must be created,

---

1077 n.1 (Pa. 2020) (citation and some internal quotation marks omitted). "According to Facebook, Inc., unlike personal Facebook profiles, which are for non-commercial use and represent individual people, Facebook 'Pages' . . . help businesses, organizations, and brands share their stories and connect with people." *Davison v. Randall*, 912 F.3d 666, 673 (4th Cir. 2019) (some internal quotation marks omitted).

received or retained pursuant to law or in connection with a transaction, business or activity of the contracting agency." *W. Chester Univ. of Pennsylvania v. Browne*, 71 A.3d 1064, 1068 (Pa. Cmwlth. 2013) (citations omitted). As the RTKL generally presumes a record in the possession of an agency to be a public record, *see* 65 P.S. § 67.305, if an entity wishes to bar disclosure, it must prove by a preponderance of the evidence that the information sought is privileged or otherwise exempt from disclosure. *See, e.g.,* 65 P.S. § 67.708(a)(1) and (b) (Exceptions for public records). Of particular relevance here, "[s]chool districts are local agencies subject to the RTKL's public record access provisions[.]" *Cent. Dauphin Sch. Dist. v. Hawkins*, 286 A.3d 726, 741 (Pa. 2022).

## II. FACTS AND PROCEDURAL HISTORY

With these legal precepts in mind, we now turn to the relevant factual and procedural history of the instant matter. In May 2021, a high school library in Penncrest School District ("Penncrest" or "the district"), located primarily in Crawford County, had approximately 70 books on display. In anticipation of Pride Month, several of the books addressed LGBTQ+ issues. A third-party contractor, working for Penncrest, and onsite at the high school, photographed the display and publicly posted it to Facebook. *See* Petition for Judicial Review, 9/16/21, at Ex. C. *See also* N.T., 11/16/21, 10.

Shortly thereafter, David Valesky, a member of the Penncrest School Board ("Board") publicly "shared" the post on his own personal Facebook account, along with the following commentary:

> This is on display at Maplewood High School. Besides the point of being totally evil, this is not what we need to be teaching kids. They aren't at school to be brainwashed into thinking homosexuality is okay. Its actually being promoted to the point where it's even "cool."

Answer to Petition for Judicial Review, 10/27/21, at Ex. C (*verbatim*). Another Board member, Luigi DeFrancesco, also "shared" the original post on his own personal Facebook account but did so without adding any additional comment.[3] *See id.* at Ex. D.

A few days later, the Meadville Tribune, a local newspaper, published an article entitled: "Display of LGBTQ books at Maplewood draws debating comments on Facebook." *Id.* at Ex. B. The article indicated that the Tribune had spoken to Valesky, who stated that he intended to bring the matter up at the next Board meeting. Shortly thereafter, Thomas Cagle, a local resident, submitted a RTKL request to Penncrest, seeking disclosure of the following:

> 1. All written correspondence (including e-mails) from [Valesky] to Penncrest [] officials, employees, or students regarding homosexuality, including e-mails originating from [] Valesky's personal e-mail account, between January 1, 2020 through June 13, 2021.
>
> 2. All written correspondence (including e-mails) from [DeFrancesco] to Penncrest [] officials, employees, or students regarding homosexuality, including e-mails originating from [] DeFrancesco's personal e-mail account, between January 1, 2020 through June 13, 2021.
>
> 3. All Facebook posts and comments by [] Valesky related to homosexuality and Penncrest [], its officials, employees, or students, or its curriculum,

---

[3] According to Facebook's Help Center, each Facebook account contains an "audience selector" tool, which allows the user to choose a specific audience when posting. These options include "public," which "means anyone including people off of Facebook can see it" and "friends (+ friends of anyone tagged)," an option that "lets you post stuff to your friends on Facebook. If anyone else is tagged in a post, then the audience expands to also include the tagged person and their friends." https://www.facebook.com/help/211513702214269/?helpref=uf_share (last accessed March 21, 2025). A user can also choose to make a post only visible to themselves, or create a "custom" option, which allows the person to "selectively share something with specific people, or hide it from specific people." *Id.* According to the Commonwealth Court, "the posts at issue were flagged 'public,' and thus viewable by the public before the posts were flagged 'private' or removed." *Penncrest v. Cagle*, 293 A.3d 783, 800 n. 26 (Pa. Cmwlth. 2023) (*en banc*). However, it is not entirely clear from the record whether the posts were accessible to the public in general or only to those that were on the Board members' "friends list."

physical recourses [*sic*], or electronic resources, between January 1, 2020 through June 13, 2021, including posts or comments removed by [] Valesky.

4. All Facebook posts and comments by [] DeFrancesco related to homosexuality and Penncrest [], its officials, employees, or students, or its curriculum, physical recourses [*sic*], or electronic resources, between January 1, 2020 through June 13, 2021, including posts or comments removed by [] DeFrancesco.

5. All comments to the Facebook posts identified in request number 3, including comments deleted or removed by [] Valesky.

6. All comments to the Facebook posts identified in request number 4, including comments deleted or removed by [] DeFrancesco.

Petition for Judicial Review, 9/16/21, at Ex. A. *See also id.* at Ex. C at 1 (asserting that: (1) members of the Board "are using personal social media and e-mail accounts to comment and discuss District business[;]" (2) the requested posts and comments have since been removed or made private; and (3) "[t]he issue of treatment of LGBTQ+ students and related [Penncrest] policies [have become] an important topic of public and official debate[,]" which is evinced by the fact that "[h]undreds of members of the general public" attended subsequent school board meetings to address these issues).

By letter dated July 7, 2021, Penncrest's Open Records Officer informed Cagle that Penncrest was granting in part and denying in part his request. More specifically, while Penncrest provided, *inter alia*, emails from Valesky's and DeFrancesco's Penncrest-associated accounts, it denied all social media-related inquiries on the basis that no such posts or comments existed on any Penncrest-owned Facebook accounts. *See id.* at Ex. B. Cagle timely appealed to the Pennsylvania Office of Open Records ("OOR").

After undertaking its own review, the OOR granted relief in Cagle's favor. In so doing, the OOR, citing, *inter alia*, *Purdy v. Borough of Chambersburg*, No. AP 2017-1229, 2017 WL 3587346 (Pa. Off. Open Recs., filed August 16, 2017), and *Boyer v. Wyoming Borough*, No. AP 2018-1110, 2018 WL 4293461 (Pa. Off. Open Recs., filed September

5, 2018), explained that rather than looking at the ownership of the account, its review entailed reviewing the contents of the Facebook page to determine whether it was "used as a significant platform by an elected official or employee to conduct or discuss official business[.]" OOR Final Determination, 8/24/21, at 7. *See also* Petition for Judicial Review, 9/16/21, at Ex. E. Addressing the particular facts of this case, the OOR noted that when approached for comment by the Meadville Tribune, Valesky stated that the book display at the center of underlying controversy would be brought up at the next school board meeting and in fact, the matter was discussed during the June 2021 work session and Board meeting. *Id.* at 7-8. The OOR opined that under these circumstances, the records were subject to disclosure. *Id.* at 8. *See also id.* (observing that the District did not "set forth any additional reasons for withholding the records under the RTKL").

Penncrest challenged this decision by filing a Petition for Judicial Review with the trial court. During the ensuing argument, Penncrest, while conceding that it did not "matter" whether the at-issue documents were on a School District device or platform, reiterated that there was "no question" that the Facebook profiles were personal accounts operated by the individual Board members, as Penncrest did not have its own social media page.[4] N.T., 11/16/21, at 4. Penncrest further explained its belief that for purposes of the appeal, the relevant inquiry was whether the information sought was "a record or a public record of the District." *Id.* at 4. In an attempt to answer this question, Penncrest explained that while there was some public discussion about the book display at a Board meeting, "there was never an agenda item with regard to the issue at hand[.]" *Id.* Consequently, in Penncrest's view, the posts and comments pertaining to the book display on the personal Facebook accounts of two board members were not records

_____

[4] By this time, the only issue remaining involved the disclosure of the Board member's Facebook posts and comments. *See* N.T., 11/16/21, at 3-4 (explaining that the email component of Cagle's RTKL request had since been resolved).

under the RTKL. *Id.* at 4-5. *See also id.* at 6 (arguing "that the information that was sought did not document any transaction or activity of the District"); and *id.* at 7 (insisting that there was no support for Cagle's suggestion that the Board members "were somehow acting in their official capacities").

For his part, Cagle contested Penncrest's claim that the posts did not discuss district business. *See id.* at 12 ("[T]he District in [its] brief admits that the [l]ibrary books that were in the photograph are assets of the District. [It] admit[s] that the display in question was created by a District employee. As I mentioned, two [] Board members shared that post. One of those [] Board members shared additional comments to that post addressing what students are learning. And that's the essence of the [] District; what students are learning. If that's not District business, then nothing is."). Unsurprisingly, Cagle continued to argue in favor of disclosure, maintaining that "[p]ublic business should not be discussed in secret by government officials using their personal accounts." *Id.* at 15.

The trial court took the matter under advisement and on December 16, 2021, filed an opinion and order denying Penncrest's petition. In its opinion, the trial court conceded that at first blush, Penncrest's primary argument, *i.e.*, that it did not own, possess, or have access to the private Facebook accounts of two Board members and thus, its contents did not meet the definition of a record, was "appealing." Opinion and Order, 12/16/21, at 2. However, upon closer inspection, the court found that it did "not matter if a Facebook post was made on the school's Facebook page or on the personal computer of the [B]oard member's private Facebook page." *Id.* at 3. This is because, the court explained, "[t]hese posts can become a 'record' if they are created by person(s) acting as a school board member and contain information related to a school transaction, business or activity." *Id. See also id.* at 5 ("Public officials commenting about public business do not need the

approval or authorization of the agency to express their views."). Regarding Valesky's post specifically, the court found that Valesky described the book display as "evil," and indicated his intent to bring the matter up for discussion at the next Board meeting. In the trial court's view, these statements reflected Valesky's belief as a "Board member that the display of the school's books in the school library was an activity for which the school board could take action." *Id.* at 4. Finding that Valesky was expressing his views about a topic that is clearly within the purview of the Board, the trial court opined that Valesky had created a public record subject to RTKL disclosure. *Id.*

Altogether, the trial court found that "the Facebook posts being requested in this case involve communications between two Board members directly related to a transaction, business or activity within the core oversight responsibilities of the [] Board[,]" and it was of no moment that it was not a Board agenda item. *Id.* at 4-5. In fact, the court found that there was a "stronger argument" in favor of disclosure of Facebook posts under the RTKL because it is a "platform to express viewpoints far faster and more broadly than a private email." *Id.* at 3. In this regard, the trial court declined to accept "Penncrest's constrained conception of what constitutes business or activity" of a school board, emphasizing that "the statutory definition of record does not require that the business or activity be an agenda item." *Id.* at 5. On these bases, the trial court held that Penncrest's appeal was without merit. *Id.* at 6. Penncrest timely appealed to the Commonwealth Court.

In a published opinion authored by Judge Lori Dumas, a split *en banc* panel of the Commonwealth Court vacated the trial court's order and remanded with instructions. *Penncrest v. Cagle*, 293 A.3d 783 (Pa. Cmwlth. 2023) (*en banc*).[5] To begin, the court engaged in a lengthy discussion of the RTKL, including distilling the meaning of "record"

---

[5] Judges McCullough, Covey, and Wallace dissented without opinion.

under the statute. *See, e.g., id.* at 789 ("Courts have construed the following phrases within th[e] definition [of 'record:'] (1) 'documents a transaction or activity of an agency[;'] (2) 'in connection with a transaction, business or activity[;'] and (3) 'of the agency.'"). To assist in this endeavor, the Commonwealth Court relied heavily upon prior cases that dealt with the RTKL and in particular, disclosure of emails belonging to public figures. *See id.* at 789-791 (defining: (1) "documents" as "proves, supports, or evidences[;]" (2) "in connection with a transaction, business or activity" as, *inter alia*, a post that "directly relates to the agency's governmental function[;]" and (3) "of the agency" as a limited phrase indicating "a record's origin.").

Although consulting this area of RTKL cases as part of its review, the court acknowledged that "email differs from social media as a method of communication." *Id.* at 793. Narrowing its review, the intermediate court, recognizing the dearth of case law in this Commonwealth pertaining to a RTKL request for records of social media activity, addressed two OOR cases that were recently decided. *See Purdy* and *Boyer*.

As explained by the court:

In *Purdy*, the requester sought from the borough all Facebook posts and comments from the mayor's private Facebook account. The borough opposed the request, arguing that the requester sought "records of a private Facebook account because the account was not created, administered[,] or required by the" borough. The OOR granted the request, reasoning that the mayor's page (1) contained "discussions and posts regarding" borough activities, and (2) was linked to the borough's page. The OOR considered "immaterial" that the borough had no oversight and did not authorize the mayor's Facebook account.

In *Boyer*, the requester solicited from the borough extensive information from the mayor's "public figure" Facebook page. The borough opposed, arguing that the requester sought records of a private Facebook account not controlled by the borough. Citing *Purdy*, the OOR rejected the borough's argument. The OOR maintained that it was required to examine the content of the Facebook page to determine whether it was "used as a significant platform by an elected official to conduct official business." The OOR defined "official business" as including the statutory "powers and

duties of borough mayors." . . . [In this case, t]he OOR granted Boyer's appeal in part, the court of common pleas reversed, and the requester[ appealed.[6]]

*Id.* at 793-94 (internal footnotes and citations omitted). Pertinently, the panel observed that in "both decisions, the OOR examined whether (1) the public official's page had the 'trappings' of an official agency page, and (2) the contents of the posts reflected agency activities or business." *Id.* at 794. *See also id.* (noting that when "addressing whether the posts reflected agency activities or business, the OOR considered the public official's statutory duties and powers").

Turning to case law from our sister states, the Commonwealth Court explained that "[o]utside of Pennsylvania, few courts have addressed the disclosure of a public official's social media activity in an RTKL context. For example, a Washington state court resolved whether posts on a city council member's personal Facebook page were subject to disclosure under that state's RTKL equivalent." *Id.* at 795 (citing *West v. Puyallup*, 410 P.3d 1197 (Wash. Ct. App. 2018). In deciding whether the member authored the posts in her scope of employment, the Washington court inquired whether: (1) her position as a public official required the posts; (2) the city directed the posts; or (3) the posts furthered the city's interests. *See West*, 410 P.3d at 1203.

The panel also consulted federal case law relating to civil rights actions under 42 U.S.C. § 1983. It explained that in resolving liability under Section 1983, courts have considered whether a public official was acting in his official capacity when engaging in social media activity. *See id.* at 796 (noting lack of uniformity regarding how each circuit

---

[6] As noted *supra*, these cases were cited by the OOR in support of granting Cagle relief. Since then, a separate panel adjudicated an appeal filed in *Boyer* by remanding to the trial court for the application of the analytical framework articulated by the court in this case, as discussed in more detail *infra*. *See Wyoming Borough v. Boyer*, 299 A.3d 1079 (Pa. Cmwlth. 2023).

resolves Section 1983 claims, as some looked at the social media account as a whole, while others considered the contents of the social media posts more heavily).

Taken together, the court concluded that if "a public official posts on the agency's official, authorized social media account, then the RTKL analysis appears relatively straightforward" and "[p]resumptively, such posts would be public records." *Id.* at 799. Alternatively, "if a public official posted a personal social media post, *e.g.*, a family birthday, wedding, or other gathering, on the agency's social media account, the post probably would not be a record[,]" as "[a] record must document an agency transaction or activity and be created in connection with agency business." *Id.* at 799-800 (footnote omitted). In other words, "social media activity must comply with three criteria: (1) it must prove, support, or evidence an agency's transaction or activity; (2) it was created, received, or retained in connection with an agency's transaction, business, or activity; and (3) it was created by, originated with, or possessed by the agency." *Id.* at 798-99 (footnotes omitted).

Unfortunately, the court explained, the instant matter did not present such a straightforward scenario. *See id.* at 800 ("Instantly, we must resolve whether a public official's public post on his *personal* social media account is an agency 'record.'") (emphasis in original)). Thus, the court opted to craft its own analytical framework, setting forth several nonexclusive factors that it believed should be considered when resolving whether a social media post was "of an agency" under the RTKL. In particular, the court directed examination of "the social media account itself, including the private or public status of the account, as well as whether the account has the 'trappings' of an official agency account." *Id.* at 801. The court noted that as part of this review, one must "consider whether the school board member has an actual or apparent duty to operate

the account or whether the authority of the public office itself is required to run the account." *Id.*

Second, the panel explained the necessity of reviewing the at-issue posts to discern "whether such posts prove, support, or evidence a transaction or activity *of an agency.*" *Id.* (emphasis in original). *See also id.* (explaining that "the content of the posts may be reviewed to address whether the posts were merely informational in nature, *i.e.*, did not directly prove, support, or evidence the agency's governmental functions"). Along these lines, the court further directed consideration of whether "the information at issue [is] created, received, or retained by public officials in their official capacity, *i.e.*, scope of employment, as public officials." *Id.* at 802. *See also id.* ("We may consider whether the agency required the posts, the agency directed the posts, or whether the posts furthered the agency's interests.").

Based on the foregoing, and the panel's explicit disagreement with the trial court's analysis, the court vacated the lower court's order and remanded the matter to the trial court to expand the record as needed to resolve whether the Board members' social media activity constituted an agency record subject to disclosure under the RTKL. *Id.* Cagle filed a petition for allowance of appeal to this Court.

## III. ISSUE AND STANDARD OF REVIEW

We granted Cagle's petition, limited to the following issue, which was rephrased for clarity:

> Whether the Right to Know Law, 65 P.S. §§ 67.101 - 67.3104, requires the disclosure of school board members' social media posts on their private Facebook accounts relating to the propriety of a display of certain books in the school library.

*Cagle v. Penncrest*, 308 A.3d 773 (Pa. 2023) (*per curiam*). Before resolving this question, however, we must first determine whether the Commonwealth Court's decision is in line

with the RTKL and its provisions. This requires an interpretation of the RTKL, which raises a pure question of law and "thus, our standard of review is *de novo* and our scope of review is plenary." *McKelvey, supra*, 255 A.3d at, 397 n.13 (Pa. 2021).

## IV. PARTIES' ARGUMENTS

### A. Cagle's Arguments

Cagle urges this Court to reverse the Commonwealth Court's decision to the extent that it rejected the RTKL's "straightforward statutory standard[] in favor of a convoluted test for determining whether materials on personal social media accounts are 'records.'" Cagle's Brief at 9. Cagle explains that it has long been understood that the term "record" under the RTKL "refers to any 'information' that 'documents a transaction or activity of an agency and that is created, received or retained pursuant to law or in connection with a transaction, business or activity of the agency[,]' . . . 'regardless of [the] physical form or characteristics.'" *Id.* at 12 (quoting 65 P.S. § 67.102). Indeed, Cagle asserts that this definition, which is "owed a liberal construction[,] . . . can encompass not only papers, but also information stored or maintained electronically[.]" *Id.* (internal quotation marks omitted).

Turning to the case *sub judice*, Cagle contends that the only relevant questions are whether the requested information: "(1) documents a transaction or activity of the District[;] and (2) was created, received or retained either [] pursuant to law,[] or [] in connection with a transaction, business or activity of the agency." *Id.* at 13 (emphasis and internal quotation marks omitted). Cagle maintains that the requested documents "undoubtedly meet this standard[,]" *see id.*, as the Facebook posts document an activity of the District, *i.e.*, involve officials discussing District functions and operations, and were created, received, and retained in connection with activity of the District. *See id.* 14, 16. *See also id.* at 15-16 ("Cagle's request seeks Facebook posts to or from members of the

school board, and only to the extent those posts relate to both 'homosexuality' and some aspect of the District's work[.] . . . Board members' statements like Valesky's . . . bear on the work of the school board by documenting a discussion that occurs between board members about the very issues for which they make decisions as a board." (emphasis in original omitted)); *id.* at 17 ("The Facebook posts clearly refer to the District's functions and responsibilities, including those of board members."); *id.* at 18 ("Constructive possession triggers an agency's statutory obligation either to release a requested document or to justify its withholding under an RTKL exemption or privilege.").

Consistent with the foregoing, Cagle disagrees with the Commonwealth Court's decision to vacate the lower court's order and remand the matter for reconsideration under its newly-announced framework. In fact, Cagle maintains that the intermediate court's new "test" conflicts with both the RTKL's language and structure. For example, he contends that the panel's "holding that social media accounts should be examined for their 'trappings' treats social media differently from all other information potentially subject to the RTKL." *Id.* at 20. This, Cagle insists, "cannot be squared with the law's text[,]" as the statute contains only one definition for the term "record." *Id.* at 20-21. Thus, he asserts that it "does not matter under the RTKL whether a Facebook page has, for example, the District's logo, just as it would not matter if a memorandum is on the District's letterhead." *Id.* at 21. *See also id.* ("There is no dispute that emails on officials' private accounts can be subject to the RTKL[.] . . . It should likewise make no difference whether a social media post appears on a personal or government-owned account.").

Similarly, Cagle contends that the Commonwealth Court's "crabbed view" of when information documents an agency activity cannot stand. *Id.* In fact, Cagle finds the panel's holding that material cannot document an agency activity if is merely informational to be contrary to prior precedent and in tension with the settled proposition that the RTKL

be liberally construed. *Id.* at 22. *See also id.* ("For example, the statute expressly provides that records may include 'map[s]' and 'photograph[s],' refuting the Commonwealth Court's suggestion that posts that are 'informational in nature' cannot document an agency's activity.").

Cagle further argues that the Commonwealth Court "erred by incorporating an 'official capacity' requirement into the" new test, emphasizing that the court "offered no textual justification" to support this factor. *Id.* at 24. Per Cagle, the legislature's decision not to incorporate an "official capacity" factor is fatal to the Commonwealth Court's standard and, regardless, "[t]he structure of the RTKL also refutes the 'official capacity' standard[.]" *Id.* at 24-25. *See also id.* at 24 (noting that the words "official capacity" do not appear in the statute and although the lower court cited to precedent under Section 1983, this civil rights statute "does not remotely resemble the RTKL and there is no indication that the Legislature intended to model the RTKL on Section 1983.").

Finally, Cagle claims that even if the RTKL were ambiguous, the Commonwealth Court's new test would still be "erroneous" as it is incongruent "with the RTKL's purpose, creates incentives for officials to evade the law, and weakens judicial oversight in RTKL cases." *Id.* at 25. He explains:

> First, the test devised by the lower court would improperly prevent critical access to information about how our government is working. . . . Second, the Commonwealth Court's standard would create perverse incentives for public officials to use private accounts to conduct public business, even though they are frequently less secure. . . . Third, by narrowing the scope of documents that qualify as "records" subject to the RTKL, the Commonwealth Court's standard weakens the ability of requesters and courts to test whether the government has met its burden under the RTKL to justify withholding documents. . . . Finally, the Commonwealth Court's standard is not necessary to protect the legitimate personal privacy interests of government officials and employees.

*Id.* at 26-30.[7]

**B. Penncrest's Arguments**[8]

In Penncrest's view, "[i]t is not what was said in these individual [B]oard members' social media accounts that matters nearly as much as where it was said[.]" Penncrest Brief at 14. The district finds support for this proposition in the United States Supreme

---

[7] *Amici curiae* the Pennsylvania Newsmedia Association, Reporters Committee for Freedom of the Press, and the Cornell Law School First Amendment Clinic (collectively, "*Amici curiae*"), urge this Court to reject the newly-created analytical framework articulated by the panel below. *Amici curiae* explain that this new test "is overly complex and favors denial, which would lead to inappropriate delays and denials inconsistent with the goals of the remedial RTKL." *Amici curiae* Brief at 10. *See also id.* at 7-10 (discussing cases that employed, without issue, the existing two-part test "to determine whether the posts are encompassed within the definition of 'record'"). Applying the existing test here, *Amici curiae* maintain that the requested records "indisputably relate to this core curricular duty of" the Board and are subject to disclosure. *Id.* at 11.

The foregoing notwithstanding, *Amici curiae* also believe that the Commonwealth Court's directive that the matter be remanded to the lower court for the submission of additional evidence specific to social media records sets a dangerous precedent. *See id.* at 14 ("The court's pronouncement, if allowed to stand, would write into the RTKL a rule specific to social media records, encouraging agencies to invoke it and delay disclosure, potentially for years, while litigation unfolds despite having failed to meet their burden of proof before the OOR. . . . If the General Assembly had intended to create a social media-exemption specific rule, it could have done so; instead, it applied the same evidentiary burdens, procedures, and strict timelines across the board."). Accordingly, *Amici curiae* ask this Court to reverse the intermediate court's decision.

[8] At the outset, Penncrest resurrects a constitutional argument that was found to be waived on appeal. *See* Penncrest's Brief at 10 n.4 (claiming that the First Amendment is important when considering "whether posting thoughts and opinions on private social media accounts is enough to constitute a 'record' under the RTKL."). *See also Penncrest*, 293 A.3d at 788 n. 6 ("Penncrest apparently argues that Board members do not lose their First Amendment right to express their opinions on matters of personal interest. … Because Penncrest failed to raise this issue in its [Pa.R.A.P.] 1925(b) statement, Penncrest waived the issue for appellate review."). Penncrest does not contest the intermediate court's waiver determination and we decline the district's invitation to overlook this finding in favor of reviewing this constitutional argument. *See* Penncrest's Brief at 7 n.3. In any event, the issue in this case is whether the Board members' posts were subject to disclosure under the RTKL and not, as Penncrest seemingly suggests, whether the members were permitted to comment on the library display in the first instance.

Court's recent decision in *Lindke v. Freed*, 601 U.S. 187 (2024), where a city manager used his personal, public Facebook page to post about a wide range of topics, including his family and his job. A local city resident left comments on some of these posts, expressing his displeasure with the city's approach to ongoing issues. The city manager deleted these comments and subsequently blocked the resident from commenting on his posts. The resident sued the manager under Section 1983, alleging that the city manager had violated his First Amendment rights. Ultimately, in an opinion authored by Justice Amy Coney Barrett, the High Court concluded that "a government official['s] posts about job-related topics on social media . . . is attributable to the State only if the official (1) possessed actual authority to speak on the State's behalf, and (2) purported to exercise that authority when he spoke on social media." *Lindke*, 601 U.S. at 191.

In its brief, Penncrest specifically focuses on a hypothetical posed by Justice Barrett, which the district contends is directly on point with the question before this Court:

> Consider a hypothetical from the offline world. A school board president announces at a school board meeting that the board has lifted pandemic-era restrictions on public schools. The next evening, at a backyard barbecue with friends whose children attend public schools, he shares that the board has lifted the pandemic-era restrictions. The former is state action taken in his official capacity as school board president; the latter is private action taken in his personal capacity as a friend and neighbor. While the substance of the announcement is the same, the context—an official meeting versus a private event—differs. He invoked his official authority only when he acted as school board president.

*Id.* at 201–02.

In Penncrest's opinion, "Justice Barrett's profound 'offline world' hypothetical provides much needed clarity to the 'murky' online world and expansive definitions Cagle would have this Court adopt." Penncrest's Brief at 17. Reiterating that it is not what was said as much as where it was said, "*i.e.*[,] a public meeting or a backyard barbe[c]ue[,]" Penncrest urges us to "heed caution when deciding whether to expand the definition of a

'record' under the RTKL to personal Facebook, or any, social media platform accounts."
*Id.*

Relatedly, Penncrest insists that the Facebook posts are not records,[9] as they neither documented a transaction or activity, *see id.* at 24 ("Here, the Facebook post in question in this matter was originally posted by an unrelated third party from his own personal electronic device. . . . DeFrancesco and [] Valesky did not generate the original post by the unrelated third party. Instead, they 'shared' it from personal accounts."), nor were they in connection with a transaction, business, or activity. *See id.* at 25 ("Valesky's quote about the display in the Meadville Tribune article demonstrated that there was no Board (agency) action taken. In fact, [] Valesky simply stated that, '[w]e're just kind of discussing it at this point,' to describe conversations he had with [the Superintendent] and [] DeFrancesco, not the whole Board in public session."). *See also id.* at 26 ("[E]ven if [] DeFrancesco and [] Valesky's posts did relate to agency business, [i]ndividual Board members cannot act on behalf of the Board, unless the authority is delegated to them by the Board" (internal quotation marks omitted)); and *id.* at 29 ("Penncrest's Social Media Policy demonstrates that social media posts on a personal account are not 'of the agency.'").

Finally, Penncrest insists that if "Cagle's position is adopted by this Court, all public officials in the Commonwealth of Pennsylvania will be subject to the inspection of their personal social media accounts, via the RTKL, for any post, at any time, whatsoever." *Id.* at 34. *See also id.* at 35 ("If this Court adopts Cagle's argument, the RTKL will blur the

---

[9] Penncrest also challenges the statutory presumption that all records in an agency's possession are presumed to be public records. *See* 65 P.S. § 67.305. Echoing the Commonwealth Court below, Penncrest avers that this premise appears to be in tension with 65 P.S. § 67.1101, which states that on appeal, the requester must articulate the grounds upon which he asserts that the record is a public record. *See* 65 P.S. § 67.1101(a)(1). *See also* Penncrest's Brief at 19-21.

lines of personal thought, and public office, to a point that it will be irretrievably broken and incapable of being remedied.").[10, 11]

## V. DISCUSSION

[10] In his reply brief, Cagle asserts that Penncrest largely avoids discussing the RTKL's text, and "has no response to [his] reliance on the ordinary meaning of RTKL terms[.]" Cagle's Reply Brief at 2-3. Cagle further claims that Penncrest's "emphasis on the administrative appeal feature" of Section 67.1101(a)(1) is misplaced. He explains: "[t]hat feature provides that requesters appealing an agency's denial shall state the grounds upon which the requester asserts that the record is a public record. It does not in any way lessen the RTKL's emphatic presumption that agency records are public and subject to disclosure." Id. at 4 (internal citation and quotation marks omitted).

Cagle likewise disputes Penncrest's interpretation of RTKL's legislative history, emphasizing that the law was meant to expand the definition of "public record." Id. at 5-7. He criticizes the District's reliance on Lindke as well, noting that the U.S. Supreme Court decision interpreted "an inapposite federal civil rights law." Id. at 1, 9. See also id. at 9 ("Unlike Section 1983, the RTKL's designation of a 'record' does not hinge on whether the record demonstrates or constitutes 'state action,' as that term is used in the federal civil rights context."); and id. at 14 ("Reversing the decision below would not chill employe[es'] protected speech or open the door to inspections of public employees' social media accounts 'for any post, at anytime, whatsoever.'" (citation omitted)).

[11] Amici curiae the Pennsylvania School Boards Association, the Pennsylvania State Association of Township Supervisors, and the Pennsylvania State Association of Boroughs (collectively, "Amici"), note that the question posed to this Court is whether the RTKL requires disclosure of a board member's social media posts. "Amici respectfully submit that no, it does not." Amici Brief at 5. In fact, Amici insist that "[s]uch a blanket, black-and-white requirement could impose a chilling effect on the willingness of qualified, knowledgeable, and necessary individuals to serve their local communities." Id. See also id. at 12 (explaining that school board members, among other local elected officials, "are often motivated to serve due to the very reason of their personal entwinement with their local communities. . . . It is common for [board members], in particular, to be parents/guardians or grandparents of children who attend the district, or siblings or spouses of district employees. District issues are [thus] interwoven with multiple facets of [board members'] lives." (emphasis in original omitted)). See also id. at 13 ("It is urged that this Court be attentive to local leaders' concerns that a post, even innocuous in nature and about friends or family, may be subject to disclosure pursuant to the RTKL simply by nature of mentioning school district, township, or borough activity."). Thus, Amici agrees with the Commonwealth Court's decision, which it believes "appropriately recognizes the detailed analysis required to determine whether such activity reaches the level of 'official activity' to justify such an intrusion." Id. at 5. See also id at 17 ("[J]ust because a local leader has a personal relationship with the community they serve does not automatically transform the individuals posts about the community into a public record pursuant to the RTKL.").

The threshold question, *i.e.,* whether the Commonwealth Court's decision to remand the matter for the consideration of certain factors not addressed by the trial court in the first instance is contrary to the RTKL and its provisions, is a matter of statutory interpretation. "The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions." 1 Pa.C.S. § 1921(a). In interpreting a statute, "we begin by considering the plain meaning of the statute's language. If the statute's plain language is unambiguous, we must apply it without employing familiar canons of construction and without considering legislative intent." *Dubose v. Quinlan*, 173 A.3d 634, 643 (Pa. 2017) (citations and footnote omitted). *See also Easton Area Sch. Dist. v. Miller*, 232 A.3d 716, 724 (Pa. 2020) ("Only when the words of a statute are not explicit do we resort to other considerations in discerning the intent of the legislature.").

Turning to the relevant provisions of the statute, per the RTKL, "[u]nless otherwise provided by law, a public record . . . shall be accessible for inspection and duplication[.]" 65 P.S. § 67.701(a). A "public record" is defined as "[a] record, including a financial record, of a Commonwealth or local agency" that is not exempt from being disclosed or otherwise protected by a privilege. 65 P.S. § 67.102. As noted above*,* under the law, "[i]nformation, regardless of physical form or characteristics," is considered a record if it "documents a transaction or activity of an agency" and "is created, received or retained pursuant to law or in connection with a transaction, business or activity of the agency." *Id. See also id.* (providing that the term "record" includes "a document, paper, letter, map, book, tape, photograph, film or sound recording, information stored or maintained electronically and a data-processed or image-processed document").

Taken together, the law's clear and unambiguous language allows for the disclosure of all types of information, including, but certainly not limited to, postings on digital platforms, if they are found to document a transaction or activity "of an agency," and were created, received or retained pursuant to law or in connection with a transaction, business or activity "of the agency." *Id.* These provisions, unambiguous on their face, provide for a two-part inquiry that applies equally to all forms of communication, including Facebook posts.

In this case, it is seemingly undisputed that for purposes of the RTKL, Penncrest is an "agency," and the at-issue social media posts requested by Cagle, like other forms of communication, constitute information that may be subject to disclosure under the RTKL if it meets the threshold requirements cited above. That is to say, to determine if the information sought in this case was subject to disclosure, the trial court was required to consider whether it: (1) documented a transaction or activity of an agency; and (2) was created, received, or retained by an agency. *Id.* As detailed *supra*, the trial court found that the Facebook posts were disclosable records under the RTKL.

On appeal, the Commonwealth Court was charged with reviewing the trial court's decision under an abuse of discretion standard. Cognizant of the RTKL and its provisions, the intermediate court spent a significant portion of its opinion addressing how the law defines "record." Of particular significance, the intermediate court acknowledged that, to discern whether the posts were records under the RTKL, the reviewing court was required to determine whether the information was "of the agency." *See Penncrest*, 293 A.3d at 788-793; *id.* at 788-89 ("Specifically, we examine how the RTKL defines 'record,' including how a 'record' must document a transaction or activity of an agency."); and *id.* at 798 ("To briefly reiterate, Section 102 of the RTKL defines 'record' as information, *e.g.,* social media activity, 'that documents a transaction or activity of an agency and that is created,

received or retained pursuant to law or in connection with a transaction, business or activity of the agency.'"). Ultimately, the court found that the trial court's analysis as to whether the posts constituted agency records was lacking and remanded the matter for further consideration. We agree.

Whether a record is "of an agency" is a fact-specific inquiry, *see, e.g., Grine v. Cnty. Of Ctr.*, 138 A.3d 88, 95 (Pa. Cmwlth. 2016) ("In discerning whether records qualify as records 'of' a particular agency, we consider the subject-matter of the records. The location of the record or an agency's possession does not guarantee that a record is accessible to the public; rather, the character of the record controls." (citations omitted)), and as recognized by both parties, this Court has yet to encounter a case which is on all fours with the present matter.

However, there are several decisions from this Court, and the tribunals below, that are helpful in informing our analysis here. For example, in *Purdy* and *Boyer*, *supra*, the OOR addressed the disclosure of content posted to a social media page by consulting the RTKL's definition of "record."[12] In *Purdy*, the OOR found it immaterial whether the local agency had oversight over the Facebook account or authorized the public official to maintain such an account. In *Boyer*, the OOR, citing *Purdy*, explained that instead of determining who or what entity controlled the social media profile, it was required to look "at whether the content of the Facebook page show[ed] that it [was] used as a significant platform by an elected official to conduct official business such as 'among other things, economic development, community planning, maintenance, public safety and community service projects within the Borough.'" *Boyer*, 2018 WL 4293461, at *3.

---

[12] While useful when considering the interplay between the RTKL and social media, the decisions in *Boyer* and *Purdy* are not binding on this Court, *see, e.g.*, *In re Melamed*, 287 A.3d 491, 499 n.16 (Pa. Cmwlth. 2022), and our citation to these cases should not be viewed as an endorsement of their holdings.

Prior to these decisions, the Commonwealth Court addressed email communications. *See, e.g., Easton Area Sch. Dist. v. Baxter,* 35 A.3d 1259 (Pa. Cmwlth. 2012). In *Easton*, the court found that "emails should not be considered 'records' just because they are sent and received using an agency email address or by virtue of their location on an agency-owned computer[.]" *Id.* at 1264. *See also id.* (providing that personal emails that do not document activity of an agency "are simply not records").[13] Stated differently, in resolving that matter, the court seemingly acknowledged that it could not view the information in a vacuum, *i.e.*, the emails could not be deemed an agency record "simply by virtue of their location[.]" *Id.* Rather, it was required to consult the particular facts attendant to that case to discern whether the information was "of an agency." *See id.* ("While emails located on an agency-owned computer are not presumptively records of the agency simply by virtue of their location, emails that document the agency's transactions or activities are records."). *See also Barkeyville Borough v. Stearns*, 35 A.3d 91, 96 (Pa. Cmwlth. 2012) (finding that emails were subject to disclosure because, *inter alia*, the council members were acting in their official capacity as elected officials when they "exchanged emails that documented the Borough's consideration of land development plans").

These cases, and others, support the consideration of certain factors that may be pertinent only under a particular set of circumstances when discerning whether information satisfies the RTKL's two-part test. This notwithstanding, Cagle insists that in this case, the Commonwealth Court created a social-media specific test. Cagle argues that the new "test" created by the Commonwealth Court is contrary to, *inter alia*, the

---

[13] The *Easton* court also addressed and rejected an argument similar to that raised by Penncrest regarding the Board members acting in their official capacities. *See Easton*, 35 A.3d at 1264 (explaining that "[w]hile an individual school board member lacks the authority to take final action on behalf of the entire board, that individual acting in his or her official capacity, nonetheless, constitutes agency activity when discussing agency business").

RTKL's language because the statute contains only a single definition for the term "record." *See, e.g.,* Cagle's Brief at 10. *See also* 65 P.S. § 67.102 (defining record).

In our view, the Commonwealth Court did not adopt a social-media specific test, and to the extent the lower court's analysis can be interpreted as such, we reject that notion.[14] In fact, we find little about the intermediate court's analysis "new," since many of the factors articulated in its opinion have been considered in various other RTKL cases involving other types of information. For example, when deciding whether an email from a personal account is a public record subject to disclosure, courts have considered, *inter alia*, whether the agency member was acting in his "official capacity" when sending the email. *See Barkeyville*, *supra*. *See also Penncrest*, 293 A.3d at 800 ("Under our email jurisprudence, we would consider whether the school board member created the post with the school board's authority or the post was later ratified by the school board, . . . *i.e.*, in the school board member's official capacity.").

Along these lines, we agree with the Commonwealth Court that in this case, the trial court was required, but failed, to consider a host of different factors when assessing whether the Facebook posts documented a transaction or activity "of an agency." *See, e.g., Bagwell v. Off. of Atty. Gen.*, 2015 WL 5123089, at *1, *3 (Pa. Cmwlth. 2015) (memorandum opinion) (finding that email sent from judge's private email address to former prosecutor at a non-Office of Attorney General email address after his employment with the agency had ended did not qualify as a record, as it did not document a activity or transaction of the OAG). *See also* Tricia S. Lontz, *Striking the Proper Balance Between the Public's Right to Access Official Governmental Information and the Right of Private Entities to Keep Information Private: An Examination of Office of the Governor v. Bari, 22*

---

[14] Likewise, we distance ourselves from any suggestion that the factors articulated by the Commonwealth Court in this case must be applied in every case that involves social media. That being said, these considerations may prove useful in resolving matters involving similar forms of communication.

Widener L.J. 419, 430 (2013) ("If the goal of the RTKL is to increase governmental transparency, allowing access to private information because of a marginal governmental connection would not further this goal. Information created and retained by private entities does not further this goal because the government has no true input, influence, or interest in the information retained and therefore the public interest in serving as a watchdog over the government is inapplicable to such information."). This is because, as observed by *Amici*, school board members are often part of their local community and thus, district issues are frequently "interwoven with multiple facets" of members' lives. *Amici* Brief at 12 (emphasis in original omitted). Under such facts, it is necessary to consider, *inter alia*, whether a board member is posting his personal views on a private page to a limited audience or if he is publicly discussing board business in his official capacity. *See Lindke*, *supra* (recognizing the difference between a school board president's district-related announcement at a school board meeting versus a backyard barbecue); *see also Penncrest*, 293 A.3d at 801 (explaining that "the content of the posts may be reviewed to address whether the posts were merely informational in nature"). Likewise, the content of the post is relevant to discerning whether the information evinces a transaction or activity of an agency. *See Grine, supra*. This is especially relevant when considering Facebook postings, as "[m]any use social media for personal communication, official communication, or both—and the line between the two is often blurred."[15] *Lindke*, 601 U.S. at 197; *see also Penncrest*, 293 A.3d at 801 (noting the importance of examining "the social media account itself, including the private or public status of the account, as well as whether the account has the 'trappings' of an official agency account.").

---

[15] While *Lindke* involved a civil rights action filed under Section 1983, which differs in several material ways from the RTKL, Justice Barrett's hypothetical nonetheless highlights the importance of considering the context in which the sought-after information was made.

To be clear, the RTKL's definition of a record is straightforward and identifies no type-specific tests. That said, we cannot ignore the fact that, although the RTKL contains only one definition of "record," resolving whether a Facebook profile or page is a record "of an agency" requires the consideration of facts that would be relevant only to that particular form of communication, under those specific facts. Indeed, our case law is replete with case-specific examples of considerations undertaken by courts when assessing whether certain information is subject to disclosure under the law. We thus find no error in the Commonwealth Court's decision to remand this matter to the trial court for further consideration under the RTKL's well-established test.

## VI. CONCLUSION

As set forth *supra*, under the RTKL, a record is defined as information that documents a transaction or activity of an agency and is created, received, or retained pursuant to law or in connection with a transaction, business, or activity of the agency. 65 P.S. § 67.102. Today, we reaffirm that this two-part inquiry is the only test to be utilized when determining whether disclosure of information, regardless of its form, is required under the statute. As we find that the Commonwealth Court's decision is not in tension with this test but rather, articulates reasonable facts that warrant consideration when resolving whether a social media post constitutes an agency record, we affirm the holding of the Commonwealth Court and remand the matter for further proceedings.

Order affirmed.

Chief Justice Todd and Justices Brobson and McCaffery join the opinion.

Justice Dougherty files a concurring and dissenting opinion.

Justice Wecht files a dissenting opinion in which Justice Donohue joins.